**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 21 2026

TAMMY H. DOWNS, CLERK
By: [signature]
DEP CLERK

ERIC ORWOLL; PETER JULIUS CSERE; SCOTT THOMAS HALLOWOOD; WISDOM WOODS LLC, an Arkansas limited liability company; GLOBAL HOMESTEAD SOLUTIONS LLC, an Arkansas limited liability company; NORTH ARKANSAS EXCAVATION LLC, an Arkansas limited liability company; ALLEGORY ACRES LLC, an Arkansas limited liability company; and RETURN TO THE LAND, an unincorporated private membership association,

Plaintiffs,

v.

Case No. 3:26-cv-00239-BSM

UNITED STATES DEPARTMENT OF JUSTICE; HARMEET K. DHILLON, in her official capacity as Assistant Attorney General, Civil Rights Division; CARRIE PAGNUCCO, in her official capacity as Chief, Housing and Civil Enforcement Section; KATIE LEGOMSKY, in her official capacity as Trial Attorney; SHANNON SMITH, in her official capacity as Civil Chief, U.S. Attorney's Office, Eastern District of Arkansas; JONATHAN D. ROSS, in his official capacity as United States Attorney for the Eastern District of Arkansas;

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; CRAIG TRAINOR, in his official capacity as Assistant Secretary for Fair Housing and Equal Opportunity; LON D. MELTESEN, in his official capacity as Director, Office of Special Investigations; HUGH JAMES McGLINCY, in his official capacity as Investigator, Office of Special

This case assigned to District Judge Miller
and to Magistrate Judge Ervin

Investigations; ROBERT A. DOLES, in his official capacity as Acting Deputy Assistant Secretary for Enforcement; )

ARKANSAS SECURITIES DEPARTMENT; SUSANNAH MARSHALL, in her official capacity as Arkansas Securities Commissioner; JOE JOSLIN, in his official capacity as Associate General Counsel; )

DAVID CAMERON, in his official capacity as City Manager, Springfield, Missouri; )

TIM GRIFFIN, in his official capacity as Attorney General of Arkansas; )

Defendants. )

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Eric Orwoll, Peter Julius Csere, Scott Thomas Hallowood, Wisdom Woods LLC, Global Homestead Solutions LLC, North Arkansas Excavation LLC, Allegory Acres LLC, and Return to the Land (collectively, the "Plaintiffs"), by and through their undersigned counsel, for their Complaint against the above-named Defendants, state as follows:

## I. NATURE OF THE ACTION

1. This action challenges a coordinated campaign of government retaliation against the Plaintiffs for exercising their First Amendment rights of speech, association, and assembly. Beginning in July 2025, multiple government agencies—U.S. federal, state, and local—opened investigations targeting the Plaintiffs not because of any evidence of unlawful conduct, but because of media coverage portraying the Plaintiffs' private membership association as a "whites-only" real estate development. Each investigation was initiated without a complaint from an actual legitimate victim. Each investigation has been pursued despite exculpatory evidence. And each

investigation has either been escalated (by the U.S. Department of Housing and Urban Development), left perpetually open without resolution (by the Arkansas Securities Department), or abandoned into silence without closure (by the U.S. Department of Justice). The investigations themselves—not their outcomes—are the punishment.

2. The Plaintiffs are members and leaders of Return to the Land ("RTTL"), a nationwide unincorporated private membership association, and Wisdom Woods LLC, an Arkansas limited liability company that owns approximately 158 acres of land near Ravenden, Sharp County, Arkansas, where approximately forty people reside in a homesteading and agricultural community. The Plaintiffs' associational and expressive activities are protected by the First Amendment.

3. On July 21, 2025, Sky News published a documentary about RTTL containing fabricated evidence—including a digitally created photograph of a tree bearing the words "WHITES ONLY" that does not and has never existed on the property—and misleading editing designed to portray Plaintiffs' community as a "fortress for the white race." The documentary triggered a cascade of media coverage, which in turn triggered a cascade of government investigations.

4. On July 29, 2025, Defendant David Cameron, City Manager of Springfield, Missouri, issued an official statement on a .gov website—and therefore under color of law—condemning RTTL based solely on "media reports" while admitting "no one from this group has contacted the City directly." Cameron declared that "we will not stand idly by"—an official threat of government action against an organization that had never contacted his city, based on media reports that he never verified.

5. The Arkansas Securities Department ("ASD") opened an investigation in October 2025. After nearly nine months of document production and responses, Defendant Joe Joslin, the

examining attorney, stated by telephone in or about July 2026 that ASD did not plan to take any administrative action and did not plan to request any additional information. Mr. Joslin stated over the phone that ASD intended to change the status of the investigation from that of an active investigation to one of monitoring the situation because ASD was aware of other litigation involving the Plaintiffs in Sharp County, Arkansas. ASD refused to formally close the investigation even though ASD found no reason to pursue any alleged violations of Arkansas securities laws. The Plaintiffs remain under an indefinitely open securities investigation that the agency itself concedes reveals no violation.

6. On February 12, 2026, the U.S. Department of Housing and Urban Development ("HUD") opened a Secretary-initiated investigation under 42 U.S.C. § 3610(a)(1)(A)(iii)—a mechanism that bypasses the normal complaint process and does not require an underlying victim. HUD pursued that investigation for months without ever making a specific factual allegation that amounted to a statutory violation despite counsel to the Plaintiffs expressly asking HUD to articulate such a theory that the Plaintiffs could defend against. Then, on July 2, 2026, HUD proposed a draft conciliation agreement demanding: (i) a $40,000 "Compensation Fund" to be advertised by the Plaintiffs at their own expense and distributed by HUD with no independent oversight; (ii) a $10,000 civil penalty; (iii) three years of government monitoring; (iv) government-compelled speech on the Plaintiffs' inherently expressive social media platforms; and (v) restrictions on Plaintiffs' use of the word "community." No individual has ever made a factually supported claim of housing discrimination against RTTL. The Compensation Fund has no legitimate claimant.

7. Defendant Craig Trainor—HUD's Assistant Secretary for Fair Housing and Equal Opportunity—published an article in City Journal on April 28, 2026, titled "Let's Make Civil

Rights Enforcement Constitutional Again," in which he publicly stated that HUD "is a federal law enforcement agency, not a social-justice NGO," that enforcement should target "intentional discrimination," that the Fair Housing Act "must not be enforced in a manner that infringes on the free speech," and that HUD must "return to the text of the Fair Housing Act." Trainor also condemned "a racial spoils system that doles out rewards to favored constituencies." Two months later, Trainor purported to represent HUD as the named "Complainant" and signatory on behalf of HUD on the draft conciliation agreement that demanded compelled speech, a $40,000 compensation fund with no legitimate claimant, and restrictions on associational language. The contradiction between Trainor's public statements and his enforcement conduct is a glaring example of HUD's disparate treatment of the Plaintiffs.

8. On August 4, 2026, when the Plaintiffs' counsel requested a telephone call to discuss high-level concerns about the conciliation agreement before negotiating finer points—a routine professional courtesy—HUD Investigator Hugh James McGlincy refused the call and unilaterally terminated conciliation, converting the investigation to a formal Secretary-Initiated Complaint. The Plaintiffs did not refuse to conciliate. Plaintiffs asked to discuss their concerns. HUD refused to listen.

9. Simultaneously, during the course of HUD's investigation, on June 4, 2026, the U.S. Department of Justice (the "DOJ") opened a parallel investigation under the Fair Housing Act, explicitly citing the Attorney General's authority to file federal litigation directly under 42 U.S.C. § 3614(a). The investigation letter was signed by Defendant Harmeet K. Dhillon, Assistant Attorney General for Civil Rights. The Plaintiffs filed a comprehensive response on July 13, 2026. As of the date of this filing, the DOJ has not responded to Plaintiffs' submission, and the leadership of the Civil Rights Division has not responded to multiple meeting requests or communicated with

the Plaintiffs in any manner. The DOJ investigation—like the ASD investigation—remains open indefinitely, without resolution or communication.

10. These actions are not isolated. They share a common origin (media coverage of RTTL), a common pattern (investigation without underlying complaint, pursuit despite exculpatory evidence, escalation or perpetual open-endedness rather than resolution), and a common effect (chilling the Plaintiffs' First Amendment rights, stigmatizing the Plaintiffs, and imposing ongoing legal burdens without any legitimate law enforcement purpose). Whether through explicit coordination or convergent animus, the Defendants have engaged in a campaign to punish the Plaintiffs for their protected speech and association through the mechanism of government investigation itself.

11. This action seeks only declaratory and injunctive relief. The Plaintiffs do not seek compensatory or punitive damages. The Plaintiffs seek: (i) a declaration that Defendants' investigations violate the First Amendment, the Due Process Clause, and the Equal Protection guarantee; (ii) an injunction terminating the HUD, DOJ, and ASD investigations; (iii) an injunction prohibiting compelled speech; (iv) an order directing David Cameron to retract his official threat; and (v) such other relief as the Court deems just and proper.

12. The Plaintiffs have pursued all remedies available to them. The Plaintiffs fully cooperated with each investigation, produced all requested documents, and engaged in HUD's conciliation process in good faith. HUD, not the Plaintiffs, terminated that process. No further administrative remedies are available to the Plaintiffs with respect to the HUD conciliation process because HUD foreclosed that path. With respect to the ASD investigation, the Plaintiffs cannot obtain administrative closure because ASD—after admitting that it was not contemplating any enforcement action—refuses to close the investigation or provide written confirmation. With

respect to the DOJ investigation, the Plaintiffs cannot obtain administrative resolution because the leadership of the Civil Rights Division has refused to respond to the Plaintiffs' submission or meeting requests. To the extent that any administrative remedies remain, they are futile because the agencies have demonstrated bad faith, and they are inapplicable to the constitutional claims asserted here.

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the First, Fifth, and Fourteenth Amendments; the Administrative Procedure Act, 5 U.S.C. §§ 702–06; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985(3).

14. This Court has jurisdiction to grant declaratory and injunctive relief against U.S. federal officers and agencies pursuant to 5 U.S.C. § 702, which waives sovereign immunity for actions "stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." The Plaintiffs seek relief "other than money damages." *Id.* § 702. This Court also has jurisdiction to grant equitable relief against federal officers for constitutional violations under its inherent equitable authority.

15. This Court has jurisdiction over the claims against state and local Defendants under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and 42 U.S.C. § 1983.

16. Venue is proper in the Eastern District of Arkansas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Sharp County, Arkansas, which is within this District. All individual Plaintiffs reside in Sharp County. The investigations target an Arkansas community, Arkansas residents, and Arkansas entities.

Venue is also proper as to the U.S. federal Defendants pursuant to 28 U.S.C. § 1391(e)(1) because this is a civil action against officers and employees of the United States acting in their official capacities, and the Plaintiffs reside in this District.

## PARTIES

### Plaintiffs

17. Plaintiff Eric Orwoll is a citizen of Arkansas, residing in Ravenden, Sharp County, Arkansas. He is a co-founder of RTTL and a resident of the property owned by Wisdom Woods LLC. He was the primary interview subject in the Sky News documentary and is a named addressee on the DOJ and HUD investigation correspondence.

18. Plaintiff Peter Julius Csere is a citizen of Arkansas, residing in Ravenden, Sharp County, Arkansas. He is a co-founder of RTTL, a managing member of Wisdom Woods LLC, and a resident of the property owned by Wisdom Woods LLC. He was interviewed in the Sky News documentary and is a named addressee on the DOJ investigation correspondence. He was subsequently added as a Respondent in the HUD investigation and conciliation agreement without prior notice that he was under investigation.

19. Plaintiff Scott Thomas Hallowood is a citizen of Arkansas, residing in Ravenden, Sharp County, Arkansas. He is a member of RTTL, is a resident of the property owned by Wisdom Woods LLC, and was interviewed in the Sky News documentary. He was added as a Respondent in the HUD investigation and conciliation agreement without prior notice that he was under investigation.

20. Plaintiff Wisdom Woods, LLC is an Arkansas limited liability company that owns approximately 158 acres near Ravenden, Sharp County, Arkansas, and has approximately thirty-one (31) members. The limited liability company agreement of Wisdom Woods, LLC is an

expense-sharing agreement among a group of families who purchased land together for homesteading, agriculture, and rural living. Wisdom Woods, LLC is a separate legal entity from RTTL, with separate governance, separate membership criteria, and separate financial operations. It does not advertise, does not solicit members from the general public, and does not maintain any public-facing online presence. It is a named addressee on the DOJ investigation letter, the HUD request for information, and the HUD conciliation agreement, and it is subject to the ASD investigation.

21. Plaintiff Global Homestead Solutions LLC is an Arkansas limited liability company. Plaintiff Peter Julius Csere is its sole member. It provides construction and handyman services. Global Homestead Solutions LLC was included in the ASD investigation and named in HUD's February 20, 2026, document preservation demand despite having no apparent connection to any securities offering or housing transaction. It does not sell, rent, or broker real property and does not offer or sell securities. Its inclusion in these investigations exemplifies the overbroad and indiscriminate scope of the government actions challenged in this Complaint.

22. Plaintiff North Arkansas Excavation LLC is an Arkansas limited liability company. Plaintiff Scott Thomas Hallowood is its sole member. It provides excavation services. North Arkansas Excavation LLC was included in the ASD investigation and named in HUD's February 20, 2026, document preservation demand despite having no apparent connection to any securities offering or housing transaction. It does not sell, rent, or broker real property and does not offer or sell securities. Its inclusion in these investigations exemplifies the overbroad and indiscriminate scope of the government actions challenged in this Complaint.

23. Plaintiff Allegory Acres LLC is an Arkansas limited liability company. It was included in the ASD investigation despite the anonymous complainant having no information about the

entity other than the names of certain individuals associated with it. ASD opened an investigation into whether membership interests in Allegory Acres LLC constitute "investment contracts" under the Arkansas Securities Act without conducting any independent due diligence or verifying whether the entity was engaged in any activity subject to the Act. Allegory Acres LLC does not offer or sell securities and does not transact business with the public. It was included in the ASD investigation and named in HUD's February 20, 2026, document preservation demand despite having no apparent connection to any housing transaction. Its inclusion in these investigations exemplifies the overbroad and indiscriminate scope of the government actions challenged in this Complaint.

24. Plaintiff Return to the Land ("RTTL") is a nationwide unincorporated private membership association with over 1,000 members. It is not a legal entity. Its primary activity is hosting social events and meetups for its members. RTTL does not own, sell, rent, lease, or otherwise make available any real estate or dwellings to its members. RTTL does not own or control any corporations, limited liability companies, or other business entities. It is separate from Wisdom Woods LLC, with separate governance, membership, and operations. RTTL is a named addressee on the DOJ investigation letter. Inaccurate media coverage of RTTL—and the intentional mischaracterization of its First Amendment-protected public communications—are the primary basis for the government investigations challenged herein.

**Defendants**

Department of Justice Defendants

25. The Defendant U.S. Department of Justice opened an investigation into Plaintiffs on June 4, 2026, under the Fair Housing Act, DJ# 175-9-147, through its Civil Rights Division, Housing and Civil Enforcement Section. The Plaintiffs are suing the DOJ in its official capacity

for declaratory and injunctive relief.

26. Defendant Harmeet K. Dhillon is the Assistant Attorney General for Civil Rights. She signed the June 4, 2026, investigation letter citing the Attorney General's litigation authority under 42 U.S.C. § 3614(a). The Plaintiffs are suing Assistant Attorney General Dhillon in her official capacity.

27. Defendant Carrie Pagnucco is the Chief of the Housing and Civil Enforcement Section. Her name appears as approving official on the June 4, 2026, investigation letter. The Plaintiffs are suing Ms. Pagnucco in her official capacity.

28. Defendant Katie Legomsky is a Trial Attorney in the Housing and Civil Enforcement Section and the contact person identified in the June 4, 2026, investigation letter. The Plaintiffs are suing Ms. Legomsky in her official capacity.

29. Defendant Shannon Smith is the Civil Chief of the U.S. Attorney's Office for the Eastern District of Arkansas. She was copied on the DOJ investigation letter. Upon information and belief, she participated in or was aware of the decision to open the DOJ investigation. The Plaintiffs are suing Ms. Smith in her official capacity.

30. Defendant Jonathan D. Ross is the U.S. Attorney for the Eastern District of Arkansas, appointed by the U.S. District Court effective March 17, 2022. As U.S. Attorney, he is the top-ranking U.S. federal law enforcement official in the Eastern District of Arkansas. His office is responsible for prosecuting U.S. federal crimes and defending the United States in civil cases within the district. The DOJ investigation letter was copied to his Civil Chief, Defendant Smith. Upon information and belief, a complaint regarding RTTL was sent to his office by the anonymous activist described herein. As the official responsible for civil enforcement in the district, Defendant Ross participated in, authorized, or was aware of the decision to open and pursue the DOJ

investigation targeting the Plaintiffs. The Plaintiffs are suing Mr. Ross in his official capacity for declaratory and injunctive relief.

Department of Housing and Urban Development Defendants

31. The Defendant U.S. Department of Housing and Urban Development ("HUD") opened a Secretary-initiated investigation into the Plaintiffs on February 12, 2026 (HUD Inquiry 869910), through its Office of Fair Housing and Equal Opportunity, Office of Special Investigations, and subsequently converted it to a Secretary-Initiated Complaint. The Plaintiffs are suing HUD in its official capacity for declaratory and injunctive relief.

32. Defendant Scott Turner is the Secretary of HUD. The investigation is "Secretary-initiated" under 42 U.S.C. § 3610(a)(1)(A)(iii) and was opened under his ultimate authority. The Plaintiffs are suing Secretary Turner in his official capacity.

33. Defendant Craig Trainor is the Assistant Secretary for Fair Housing and Equal Opportunity at HUD and the named "Complainant" in the draft conciliation agreement prepared by HUD. The Plaintiffs are suing Assistant Secretary Trainor in his official capacity.

34. On information and belief, Defendant Lon D. Meltesen is the Director of the Office of Special Investigations, FHEO, HUD, and the approval signatory on the July 2, 2026, conciliation agreement. The Plaintiffs are suing Director Meltesen in his official capacity.

35. Defendant Hugh James McGlincy is an Investigator in the Office of Special Investigations and the day-to-day contact for the HUD investigation. On information and belief, prior to the appointment of Mr. Meltesen, Mr. McGlincy served as the Acting Director of the Office of Special Investigations. He sent the August 4, 2026, email refusing the Plaintiffs' conciliation discussion request and converting the investigation to a formal complaint. The Plaintiffs are suing Mr. McGlincy in his official capacity.

36. Defendant Robert A. Doles is the Acting Deputy Assistant Secretary for Enforcement, FHEO, HUD. He signed the initial investigation letter (February 12, 2026) and the request for information cover letter (February 20, 2026). The Plaintiffs are suing Acting Deputy Assistant Secretary Doles in his official capacity.

Arkansas Securities Department Defendants

37. The Defendant Arkansas Securities Department is an agency of the State of Arkansas. It opened an investigation into the Plaintiffs in October 2025 and has refused to close that investigation despite admitting, through its examining attorney, that no administrative action is planned and no further information is needed. The Plaintiffs are suing the Arkansas Securities Department in its official capacity for declaratory and injunctive relief under § 1983.

38. Defendant Susannah Marshall is the Arkansas Securities Commissioner. As Commissioner, she is the head of the Arkansas Securities Department and exercises ultimate authority over its investigations and enforcement actions, including the investigation of the Plaintiffs. The Plaintiffs are suing Commissioner Marshall in her official capacity for declaratory and injunctive relief under § 1983.

39. Defendant Joe Joslin is the Associate General Counsel of the Arkansas Securities Department and the examining attorney for the ASD investigation. He sent the first and second information requests. In or about July 2026, he stated by telephone to the Plaintiffs' counsel that ASD did not plan to take administrative action and did not plan to request additional information, but refused to close the investigation and refused to provide written confirmation. The Plaintiffs are suing Mr. Joslin in his official capacity for declaratory and injunctive relief under § 1983.

State Government Defendant

40. Defendant Tim Griffin is the Attorney General of Arkansas. Beginning in July 2025,

following the Sky News documentary, Defendant Griffin repeatedly stated to media outlets that his office was "reviewing" or "looking into" RTTL, and publicly condemned Plaintiffs' First Amendment-protected speech and association. He never informed Plaintiffs of any investigation, never contacted Plaintiffs directly, and never issued any findings or closure. By maintaining an open-ended, uncommunicated "review" while making public statements that condemn and stigmatize Plaintiffs' protected expression, Defendant Griffin—the state's chief law enforcement officer—has contributed to the campaign of government retaliation against the Plaintiffs for their protected speech and association. The Plaintiffs are suing Attorney General Griffin in his official capacity for declaratory and injunctive relief under § 1983.

Local Government Defendant

41. Defendant David Cameron is the City Manager of Springfield, Missouri. On July 29, 2025, he issued an official statement on the City of Springfield's .gov website condemning RTTL and threatening that "we will not stand idly by." His statement admitted that "no one from this group has contacted the City directly" and that he was acting on "media reports." The statement was issued under color of law and constituted an official threat of government action against the Plaintiffs based on unverified media reports about their protected associational activities. The Plaintiffs are suing City Manager Cameron in his official capacity for declaratory and injunctive relief under § 1983.

## FACTUAL BACKGROUND

### The RTTL Community and Its Constitutionally Protected Activities

42. Return to the Land ("RTTL") is a nationwide unincorporated private membership association with over 1,000 members. It is not a legal entity. Its primary activity is hosting social events and meetups. It does not sell, rent, lease, or broker real property and does not engage in real

estate transactions of any kind. RTTL does not own or control any corporations, limited liability companies, or other business entities. To the knowledge of RTTL, approximately three percent of RTTL's membership is involved in the collective ownership of land through entities that are separate from RTTL.

43. Wisdom Woods, LLC is an Arkansas limited liability company originally established by members of RTTL for the purposes of owning land and other assets in Arkansas, sharing the expenses related to such assets, and founding an intentional community of families. Wisdom Woods, LLC currently owns approximately 158 acres near Ravenden, Sharp County, Arkansas, and has approximately thirty-one (31) members. Wisdom Woods, LLC is not a subsidiary or affiliate of RTTL. It does not advertise, does not solicit members from the general public, and does not maintain any public-facing online presence.

44. RTTL and Wisdom Woods, LLC are operated with bona fide separation. They have separate governing boards, separate founding documents, separate membership, separate admission criteria, separate financial operations, and separate public presence. Membership in RTTL does not confer membership in Wisdom Woods, LLC, and membership in Wisdom Woods, LLC does not confer membership in RTTL. A person accepted into RTTL is not automatically accepted into Wisdom Woods, LLC.

45. The Plaintiffs' associational activities are protected by the First Amendment. The U.S. Supreme Court has recognized that freedom of association—the right to form and maintain private groups organized around shared values, beliefs, and cultural heritage—is a fundamental constitutional right.

46. The Plaintiffs' speech activities are also protected. RTTL and its members engage in public advocacy through multiple platforms: a Substack newsletter, an X (formerly Twitter)

account, YouTube videos depicting homesteading and rural life, a Telegram channel, and a public website (returntotheland.org). These speech activities address matters of public concern—land use, intentional communities, cultural heritage, private association rights, and constitutional law.

47. In 2025, the Arkansas Fair Housing Commission investigated RTTL in response to media inquiries. The Commission found no evidence of wrongdoing and took no action against RTTL or any associated entity. This prior investigation—by the state agency with direct jurisdiction over fair housing matters in Arkansas—and its exculpatory outcome is significant: the first government agency to examine RTTL's activities concluded there was no violation of law.

**The Media Trigger: The Sky News Documentary**

48. In approximately March 2025, Tom Cheshire, a reporter for Sky News, contacted Plaintiff Orwoll and requested permission to visit the property owned by Wisdom Woods, LLC to produce a news report. Messrs. Orwoll, Csere, and Hallowood invited Cheshire and his crew to visit, believing in good faith that Sky News intended to produce a fair and balanced report about their homesteading community.

49. Cheshire and two other Sky News employees spent several days on the property owned by Wisdom Woods, LLC in or about May 2025. They conducted interviews with Messrs. Orwoll, Csere, Hallowood, and other residents and filmed the property and residents' daily activities.

50. On July 21, 2025, Sky News published a documentary on YouTube titled, "Inside the U.S. community building a 'fortress for the white race' | 'Return to the Land'" (the "Documentary"). The Documentary contained multiple false statements of fact and fabricated evidence, including: (a) A digitally created photograph depicting a tree on the Wisdom Woods property bearing a red spray-painted RTTL logo and the words "WHITES ONLY." This image was created in post-production. No such tree, signage, or markings exist or have ever existed on

the property. The image is a fabrication. (b) Misattribution of an X post from the "@RTTL_Official" account stating, "We started a whites-only community"—a tongue-in-cheek response to prior media defamation presented as if it were a literal policy declaration referring to the Wisdom Woods property. (c) Misleading editing of Orwoll's response to Cheshire's question about whether the community was "whites only"—Orwoll did not answer affirmatively, but the video was edited to create the false impression that he did.

51. In a written companion article, Cheshire disclosed that he personally contacted the Arkansas Attorney General and solicited a statement, confirming that the reporter personally initiated contact with the state's chief law enforcement officer for the purpose of triggering a government investigation against the Plaintiffs. The Documentary's closing segment states that the Arkansas Attorney General announced his office was "reviewing the matter."

52. As of the date of this filing, the Documentary has accumulated approximately 1.9 million views on YouTube. It triggered extensive additional media coverage, including articles in Newsweek, CNN, The New York Times, the Arkansas Times, and numerous other outlets.

53. On July 24, 2026, Plaintiffs Orwoll, Csere, and Hallowood filed a separate defamation action in this Court against Sky UK Limited, Comcast Corporation, and Tom Cheshire arising from the Documentary. That separate action, *Orwoll et al. v. Sky UK Limited et al.*, Case No. 3:26-cv-00216 LPR (E.D. Ark.), seeks damages for defamation, false light, tortious interference, and civil conspiracy. This action concerns the government's response to that media coverage. Together, the two actions seek to hold accountable both the private actors who manufactured evidence to trigger government investigations and the government actors who used those investigations to punish constitutionally protected conduct.

**David Cameron's Official Threat (July 29, 2025)**

54. On July 29, 2025—eight days after the Sky News Documentary was published—Defendant David Cameron, in his official capacity as City Manager of Springfield, Missouri, published an official statement on the City of Springfield's government website (springfieldmo.gov) under the joint signature of the Springfield City Council and the City Manager.

55. The statement declared that Cameron had been "made aware of media reports regarding a group calling itself 'Return to the Land' and its alleged proposal to create a 'whites-only' enclave in the Springfield area." Critically, the statement admitted: "*While no one from this group has contacted the City directly*, we want to state in the strongest possible terms: there is no place in Springfield, or anywhere, for such a divisive and discriminatory vision." (Emphasis added.)

56. The statement further threatened: "While it is improbable that such a project could legally or practically occur within city limits, silence is not an option. *As a regional leader, we will not stand idly by* in the face of attempts to revive outdated, harmful ideologies." (Emphasis added.)

57. The statement contains multiple admissions establishing its unconstitutional character. Cameron admitted he had no firsthand knowledge—his sole basis was "media reports" triggered by a documentary containing fabricated evidence. RTTL had never contacted Springfield, proposed any development there, or engaged in any activity within Cameron's jurisdiction. The statement singled out RTTL by name, condemned its "vision" as "divisive and discriminatory," and declared that "we will not stand idly by"—a threat of official government action. The statement was published on a .gov website under color of law.

**The Arkansas Securities Department Investigation (October 2025–Present)**

58. In October 2025, the Arkansas Securities Department opened an investigation into RTTL, Wisdom Woods, LLC, Allegory Acres LLC, Global Homestead Solutions LLC, and North Arkansas Excavation LLC. The investigation was triggered by a complaint letter from an anonymous activist posing as an "investigative journalist" who, upon information and belief, is a foreign national. Without conducting any independent due diligence or verifying the allegations in the letter, ASD opened an investigation into every entity mentioned in the letter—including Global Homestead Solutions LLC and North Arkansas Excavation LLC, which are service companies that have never offered or sold securities of any kind. On October 21, 2025, Defendant Joslin sent a first information request containing six questions and nine document requests. The request was directed to entities including "RTTL Land Association LLC"—an entity that does not exist and has never existed. The anonymous complainant had fabricated this entity name, and ASD opened an investigation into it without verifying its existence. The investigation concerned whether membership interests in Wisdom Woods LLC and Allegory Acres LLC constitute "investment contracts" under the Arkansas Securities Act.

59. The Plaintiffs responded through counsel on January 5, 2026, providing a detailed legal analysis and producing Bates-numbered documents. The Plaintiffs' response argued that membership interests are not securities under the Arkansas Securities Act because membership interests confer no right to profit distributions, the entity does not do business with the public or operate on a for-profit basis, and members purchased their interests for the purpose of sharing expenses as co-owners of land—not with an expectation of profit.

60. On February 12, 2026—the same day HUD opened its Secretary-initiated investigation—ASD sent a second information request with thirteen additional items. The

Plaintiffs responded through counsel.

61. In or about July 2026, Defendant Joslin communicated by telephone with Plaintiffs' counsel, attorney Jonathan McPike of Agathos Law, LLC. During that conversation, Joslin stated that ASD did not plan to take any administrative action and did not plan to request any additional information but intended to change the status of the investigation from that of an open investigation to that of monitoring the situation. Joslin's statement constituted an admission that the ASD investigation—after nearly nine months of cooperation—had not found any violations of the Arkansas Securities Act.

62. Despite this admission, Joslin refused to close the investigation. The Plaintiffs' counsel requested written confirmation of ASD's position, and Defendant Joslin responded by e-mail, saying only the investigation remained open and refused to provide any further detail in writing.

63. The effect of this indefinite open investigation is severe. The Plaintiffs remain under document preservation obligations. The Plaintiffs cannot represent to banks, insurers, business partners, or prospective members that the investigation has been resolved. An investigation that the agency itself admits reveals no violation, yet refuses to close, serves no legitimate law enforcement purpose. It serves only to punish.

**The HUD Secretary-Initiated Investigation (February 2026–Present)**

64. On February 12, 2026, HUD initiated a Secretary-Initiated Investigation into RTTL under 42 U.S.C. § 3610(a)(1)(A)(iii), HUD Inquiry 869910, signed by Defendant Doles. A Secretary-initiated investigation requires no underlying complaint, no identified victim, and no allegation of specific harm to any individual.

65. HUD's evidence included: (a) a "Purchase a Lot" hyperlink on RTTL's website that directed visitors to a general membership application—placed by a web developer who

misunderstood the organization and removed over a year before the HUD investigation was opened; (b) membership criteria referencing "common continental ancestry" and "European heritage"—associational criteria protected by the First Amendment; and (c) a tabloid news article (footnote 15 of HUD's initiation letter) sourced from an anonymous activist blogger, which Defendant Doles relied upon to make unsubstantiated allegations of fraud.

66. On February 20, 2026, HUD sent a Request for Information with thirteen items. The Plaintiffs cooperated fully, producing responsive documents and engaging in good faith.

67. RTTL's position has always been that the Fair Housing Act does not reach its activities because RTTL does not sell, rent, broker, or facilitate real estate transactions. The Arkansas Fair Housing Commission investigated RTTL in 2025 and found no wrongdoing. This distinction between a private membership association and a real estate transaction is not a legal technicality—it is the foundation of the constitutional right of association.

**The EPIC Letter**

68. On the same day HUD mailed its accusatory Secretary-initiated investigation letter to Plaintiffs—February 12, 2026—HUD also mailed a standard Fair Housing Act complaint notification letter to EPIC Real Properties, Inc., a real estate company in Plano, Texas, regarding Inquiry No. 867711 (the "EPIC Letter"). EPIC allegedly published advertisements that appeared to offer for sale real estate for a "Muslim only" community.

69. HUD placed the EPIC Letter in the wrong envelope and mailed it to the Plaintiffs' address at Wisdom Woods, LLC in Ravenden, Arkansas—rather than to its intended recipient, Imran Chaudhary at EPIC Real Properties in Plano, Texas, which is trying to establish a real estate development for Muslims. HUD's own clerical error thus delivered into the Plaintiffs' hands direct evidence of the agency's disparate treatment. The EPIC Letter provides a contemporaneous, same-

agency, same-office, same-investigator benchmark against which the disparate treatment of Plaintiffs can be measured with unusual precision—a benchmark Plaintiffs would never have known existed but for HUD's mistake.

70. The contrast between the two letters, sent by the same agency on the same day and listing the same HUD investigator (Hugh James McGlincy) as the point of contact, is stark and clear evidence of discriminatory animus.

71. The EPIC Letter concerned a formal complaint filed by the Texas Workforce Commission—an actual complainant alleging actual discrimination, assigned an actual case number (Fair Housing Act Case No. 00-26-5019-8). The Plaintiffs' investigation had no complainant, no identified victim, and no case number. It was Secretary-initiated under 42 U.S.C. § 3610(a)(1)(A)(iii), a mechanism that bypasses the normal complaint process and requires no underlying victim.

72. The EPIC Letter explicitly assured the recipient: "We have made no determination as to whether the complaint against you has merit." The Plaintiffs' letter contained no such assurance. To the contrary, it opened by accusing the Plaintiffs of operating "under the guise of a 'private membership association'"—framing the Plaintiffs' organizational form as pretextual before any investigation had begun. It placed the word "association" in scare quotes to delegitimize the Plaintiffs' chosen form of organization.

73. The EPIC Letter devoted substantial space to informing the recipient of his rights: the right to file an answer within 10 calendar days, the right to amend that answer, the right to request conciliation at any time, the right to have the case heard by an Administrative Law Judge or in federal district court, and the right to file an individual lawsuit even if the Department dismissed the complaint. The Plaintiffs' letter informed them of no rights whatsoever. It offered no

conciliation, no process for response, and no timeline for completion of the investigation.

74. The EPIC Letter emphasized standardization and legal even-handedness: "this notification letter contains language required by the law. A similar letter is used to notify all parties whenever a formal complaint has been filed with the Department." The letter explained that HUD's "responsibility under the law is to undertake an impartial investigation" and that if "the investigation indicates that there is no evidence establishing jurisdiction, the case will be dismissed." The Plaintiffs' letter contained none of these assurances of impartiality, standardization, or the possibility of dismissal. It was adversarial and punitive in both language and structure. It suggested Plaintiffs were "possibly fraudulently" selling "communities"—a baseless accusation sourced to a tabloid-style article that cited an activist blogger as its primary source.

75. The EPIC Letter was grounded in an actual complaint filed by a state agency—an objective factual predicate for investigation. The Plaintiffs' letter was grounded in archived website content that had been corrected over seven months earlier, media coverage triggered by a documentary later revealed to contain fabricated evidence, and a tabloid article with no verifiable sources. HUD's investigation of the Plaintiffs rested on media narratives rather than facts, victims, or complaints.

76. Both letters listed Hugh James McGlincy as the HUD contact. On the same day, the same federal investigator was simultaneously responsible for: (i) a standard, procedural, rights-respecting investigation of a Texas real estate company facing an actual complaint; and (ii) an accusatory, rights-ignoring, Secretary-initiated investigation of an Arkansas homesteading community with no complainant. The same official, in the same office, on the same day, treated similarly situated FHA respondents in radically different ways. The only distinguishing

characteristic was the identity of the target: a conventional real estate company that openly planned to build a real estate development for Muslims, announced a public offering for real-estate sales, and reportedly raised $40 million, versus a private membership association portrayed in media as "whites-only," with no public offering and no real-estate sales.

77. The Plaintiffs possess the EPIC Letter only because HUD itself placed it in the wrong envelope and mailed it to the Plaintiffs' address. HUD's clerical error—putting the letter for a Texas real estate company into an envelope addressed to an Arkansas homesteading community—is what revealed the disparate treatment. That the Plaintiffs' knowledge of HUD's discriminatory conduct depends on HUD's own incompetence underscores the secrecy with which the agency conducted its extraordinary treatment of the Plaintiffs. Had HUD not made this mistake, the Plaintiffs would never have known that the same investigator, on the same day, treated a similarly situated respondent with procedural regularity and respect while subjecting the Plaintiffs to an accusatory, rights-ignoring investigation.

78. The EPIC Letter is direct evidence of disparate treatment. It establishes that HUD knew how to conduct a procedurally regular, rights-respecting, impartial FHA investigation—and chose not to do so when the target was the Plaintiffs. The contrast supports the inference that the Plaintiffs were singled out for extraordinary treatment not because of any evidence of unlawful conduct, but because of their identity, their viewpoint, and the media narrative surrounding them. This inference is further strengthened by the fact that, as alleged herein, the Arkansas Fair Housing Commission had already investigated and cleared RTTL in 2025, and the Arkansas Attorney General had publicly stated he had "not seen anything that would indicate any state or federal laws have been broken."

79. On April 28, 2026, while the HUD investigation was active, Defendant Trainor

published, "Let's Make Civil Rights Enforcement Constitutional Again," in City Journal.

80. Trainor condemned "a racial spoils system that doles out rewards to favored constituencies." He chastised HUD for acting like a "social-justice NGO" instead of a federal law enforcement agency. He quoted his predecessor, Justice Clarence Thomas, who said that civil rights enforcement gets "hijacked by the bureaucracy" in response to "special-interest groups."

81. His statements openly acknowledged that HUD and its activist attorneys have established a historic pattern and practice of improperly and unlawfully weaponizing the agency to target disfavored groups "in a manner that infringes on free speech" based on racial animus.

82. Two months later, on July 2, 2026, Trainor purported to act as the named "Complainant" on HUD's draft of the conciliation agreement, which violated every principle he had publicly articulated.

**The HUD Conciliation Demands (July 2, 2026)**

83. On July 2, 2026, HUD transmitted a proposed Title VIII Conciliation Agreement to the Plaintiffs' counsel, intended to be signed by Defendant Meltesen with Defendant Trainor as "Complainant." The agreement named as Respondents: Return to the Land, Wisdom Woods, LLC, Eric Orwoll, Peter Csere, and Scott Thomas Hallowood. Global Homestead Solutions LLC and North Arkansas Excavation LLC—though subject to HUD's document preservation demand in the February 20, 2026, request for information cover letter—were not named as Respondents in the conciliation agreement.

84. The agreement demanded unconstitutional terms:

- **$40,000 Compensation Fund (§ VI.G.27):** A fund to be advertised by the Respondents at their own expense, distributed by HUD with no independent oversight, no judicial review, no standard of proof, and no underlying complaint from any individual claiming discrimination. The fund precisely matches Trainor's description of a "racial spoils system that doles out rewards to favored constituencies."

- **$10,000 Civil Penalty (§ VI.H.31).**
- **Three-Year Monitoring** with mandatory reporting.
- **Compelled Speech (§ VI.E.23):** Government-mandated equal housing opportunity statements on all of the Plaintiffs' inherently expressive social media platforms, including YouTube, Substack, X, and Telegram—compelling the Plaintiffs to speak the government's message.
- **Restrictions on Associational Language (§ VI.E.24):** Restrictions on the Plaintiffs' use of the word "community."
- **Addition of Parties Without Prior Notice:** The original HUD investigation letter was addressed only to Wisdom Woods, LLC and Eric Orwoll. Without any prior notice, HUD subsequently expanded its investigation and conciliation agreement to include as additional Respondents: Peter Julius Csere, Scott Thomas Hallowood, Global Homestead Solutions LLC, North Arkansas Excavation LLC, and Return to the Land. None of these parties received an investigation initiation letter or any other form of notice before being named as Respondents subject to obligations including payment into a $40,000 Compensation Fund, submission to government monitoring, and alteration of their speech and association.

85. The agreement's compelled speech provisions directly contradict Trainor's public statement that the Act "must not be enforced in a manner that infringes on the free speech." Its compensation fund contradicts Trainor's condemnation of "racial spoils systems." Its addition of individuals without notice contradicts Trainor's commitment to due process.

**HUD's Bad-Faith Termination of Conciliation (August 4, 2026)**

86. On July 30, 2026 at 11:10 AM, Defendant McGlincy emailed the Plaintiffs' counsel: "I have been told that if we do not hear from you regarding conciliation this week we will consider conciliation closed, so I hope to hear from you because I do think, as we discussed, there is a possibility of successful resolution."

87. Later that same day, at 5:04 PM, the Plaintiffs' counsel responded: "We'd like to find a time to discuss some high-level issues with it with you before we start negotiating the finer points. Please let me know when works for you." This was a good-faith request for a telephone conversation—not a rejection of conciliation, not a refusal to discuss settlement terms.

88. On August 4, 2026, at 3:03 PM, Defendant McGlincy responded: "Given the objections you raised and your belief that it would be premature to discuss the Department's settlement terms, please be informed that the Department will be converting the Secretary-Initiated Inquiry into a Secretary-Initiated Complaint."

89. Defendant McGlincy was referring to a formal letter sent by counsel to the Plaintiffs in his email of August 3, 2026, in which he raised the same concerns described in this Complaint and noted that Defendant McGlincy sent his draft of the conciliation agreement to counsel to the Plaintiffs without ever having reviewed the second of two document productions that the Plaintiffs produced to HUD. Counsel to the Plaintiffs only learned about this because Defendant McGlincy e-mailed him on July 16, 2026—two full weeks before providing a draft of the conciliation agreement—telling him that HUD had lost the second document production that counsel to the Plaintiffs had overnighted in hardcopy. Counsel to the Plaintiffs told Defendant McGlincy that the Plaintiffs believed that it would be premature to discuss the terms of the conciliation agreement in detail "until such time as the Department has confirmed to the Respondents in writing that the Department has in fact reviewed all of the documents produced by the Respondents in each of the Respondents' productions."

90. The sequence demonstrates that HUD—not the Plaintiffs—terminated conciliation. HUD pressed for conciliation, the Plaintiffs asked to discuss concerns, HUD refused the call, mischaracterized the Plaintiffs' position by ignoring the concerns of counsel to the Plaintiffs over lost documents and an incomplete review of the evidence, and escalated to a formal complaint.

91. The Plaintiffs sought conciliation. HUD foreclosed it. HUD has escalated to a formal complaint without articulating any clear legal theory against the Plaintiffs and without identifying a single bona fide real estate offer, sale, or transaction that would be subject to the Fair Housing

Act.

**The DOJ Civil Rights Division Investigation (June 2026–Present)**

92. On June 4, 2026, the Civil Rights Division of the DOJ opened an investigation under the Fair Housing Act, DJ# 175-9-147, signed by Defendant Dhillon and countersigned by Defendant Pagnucco, with Defendants Smith and Ross copied. The letter explicitly cited the Attorney General's authority to file federal litigation under 42 U.S.C. § 3614(a).

93. An attachment to the letter contained eight document requests, including demands that Plaintiffs explain their "European heritage" and "common continental ancestry" criteria (Request 6) and state their legal position on FHA applicability (Request 8) — demands that Plaintiffs justify their protected associational choices.

94. The Plaintiffs filed a comprehensive executed response on July 13, 2026, through counsel, addressing all eight requests and producing Bates-numbered documents. The Plaintiffs' counsel also transmitted a letter dated July 7, 2026 requesting a meeting with the leadership of the Civil Rights Division.

95. As of the date of this filing, the leadership of the Civil Rights Division has not responded to the Plaintiffs' submission, has not responded to multiple meeting requests, and has not communicated with the Plaintiffs in any manner. Neither the Civil Rights Division in Washington nor Defendant Ross's office in Little Rock has responded. The DOJ investigation remains open. The Civil Rights Division's silence—like ASD's refusal to close—leaves the Plaintiffs in perpetual legal uncertainty, prevents judicial review, and chills protected activity.

**DOJ Closed an Investigation into EPIC Based on Criteria Plaintiffs Also Satisfy**

96. The clearest comparator for DOJ's conduct is DOJ's own prior investigation of EPIC.

97. On April 11, 2025, U.S. Senator John Cornyn wrote to Assistant Attorney General

Dhillon requesting that the Civil Rights Division investigate whether EPIC City's marketing to a single religious community violated the Fair Housing Act. DOJ opened an investigation.

98. On June 13, 2025, Assistant Attorney General Dhillon, over her own signature and countersigned by Defendant Pagnucco, the same two officials who signed the June 4, 2026 letter opening DOJ's investigation of Plaintiffs, closed the EPIC investigation. *See* https://npr.brightspotcdn.com/06/f5/520b8fd84c9181e2f1e864d8fddd/2025-06-13-letter-from-doj-to-epic.pdf.

99. The closure letter identified three grounds for closing the investigation: (1) the underlying property, though purchased, remained "in the planning stage" and the developer had "not yet sought any permits to develop the property"; (2) the developer expected to begin permitting only in the following months, with full development taking "several years"; and (3) the developer affirmed that "all will be welcome" in any future development and committed to revise its marketing materials to reflect its obligations under the Fair Housing Act. On the strength of those representations alone, Dhillon closed the investigation and thanked the target for its cooperation.

100. By the standard Dhillon herself applied and signed less than a year earlier, Plaintiffs' investigation should already be closed. Unlike EPIC, which had purchased land, taken in roughly $40 million from approximately 500 lot sales, and openly marketed the development to a single faith community, Wisdom Woods has never sold or advertised a single lot to the public, has sought no permits, has no timeline for seeking any, and has taken affirmative steps to ensure that nothing in its public communications could be construed as implicating the Fair Housing Act. Plaintiffs satisfy every closure criterion Dhillon articulated for EPIC, yet DOJ closed its investigation of an active $40 million commercial development within two months of opening it, while its

investigation of Plaintiffs — who have transacted in no real estate at all — remains open. Dhillon's personal, signed application of a closure standard to one project, followed within a year by her personal decision to open and sustain an investigation against a group that meets that same standard, is direct evidence of disparate treatment.

**Other Identity-Based Community Initiatives Not Investigated**

101. The EPIC investigation is not the only available comparator. Publicly available information, offered here on information and belief and subject to further development in discovery, identifies other organizations that publicly organize community or housing-related initiatives around a shared racial, ethnic, or other identity characteristic, without having faced any Secretary-Initiated or Division-initiated federal investigation comparable to the one directed at Plaintiffs.

102. Habitat for Humanity International publicly advertises initiatives specifically directed at advancing Black homeownership, describing race-conscious programming on its own website. *See* Habitat for Humanity, Advancing Black Homeownership, https://www.habitat.org/our-work/advancing-black-homeownership. Upon information and belief, this initiative has not been the subject of any HUD Secretary-initiated investigation or DOJ Civil Rights Division investigation of the kind directed at Plaintiffs.

103. A group called "Black to the Land" publicly describes itself as facilitating "planned, cooperative living spaces where African Americans gather to build safety, generational wealth, culture, and food sovereignty on their own terms." *See* https://www.blacktotheland.com. Upon information and belief, Black to the Land has not been the subject of any comparable federal investigation, notwithstanding that it organizes intentional community around shared racial identity in a manner not meaningfully distinguishable, for purposes of the Fair Housing Act, from

RTTL's own public statements about its own community.

104. A senior housing residence for individuals identifying as LGBTQ in Washington, D.C. received public grant support in connection with its opening, rather than facing federal investigatory scrutiny for organizing around a shared identity characteristic. *See* Interview, NPR, LGBTQ home for seniors in D.C. (Apr. 15, 2025), https://www.npr.org/2025/04/15/nx-s1-5261718/lgbtq-home-seniors-dc.

105. Plaintiffs are aware of no principled, viewpoint-neutral basis for treating these organizations' public, identity-based community and housing initiatives differently from RTTL's own public statements about organizing community around shared heritage — other than the racial and viewpoint content of what each organization has said publicly.

**Harm to Plaintiffs**

106. The government actions have caused and continue to cause severe and ongoing harm:

107. **First Amendment chill.** The Plaintiffs are deterred from posting on social media, publishing articles, or speaking publicly. Prospective and existing members are hesitant to associate openly.

108. **Legal fees.** The Plaintiffs have incurred substantial legal fees responding to the HUD, DOJ, and ASD investigations.

109. **Reputational harm.** Open federal and state investigations stigmatize Plaintiffs in their community, business relationships, banking, and insurance.

110. **Emotional distress.** Simultaneous multi-front government actions cause severe anxiety, stress, and fear, compounded by perpetual uncertainty.

111. **Property value diminution.** The stigma of multiple open investigations has diminished the value of Wisdom Woods LLC's real property.

112. **Deterrence of prospective members.** The stigma of multiple open investigations has caused a decline in membership applications to RTTL.

113. **Loss of privacy.** The Plaintiffs' personal information has been exposed through government investigations and associated media coverage.

114. **The harm is irreparable.** The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.

## THE CONSPIRACY — COMMON ALLEGATIONS

115. The government actions described above share a common origin, follow a common pattern, target common victims, and produce a common effect. Whether through explicit coordination or convergent animus, the Defendants have engaged in a concerted campaign to punish the Plaintiffs for their protected speech and association.

### Common Origin—Media-Driven Viewpoint Animus

116. Every action traces to the Sky News Documentary or its ensuing media coverage. Cameron explicitly cited "media reports" and admitted no direct contact. HUD relied on media coverage and an anonymous blogger. The DOJ cited RTTL's public website as described in media coverage, not as it actually was. ASD opened its investigation in the same timeframe as the media firestorm. None of these investigations was triggered by a complaint from an individual claiming discrimination.

### Common Pattern—Investigation Without Complaint

117. HUD used the Secretary-initiated mechanism (§ 3610(a)(1)(A)(iii)), requiring no complaint. The DOJ opened its investigation without identifying any victim. ASD opened its investigation without a complaint from an actual, legitimate investor. Legitimate civil rights enforcement begins with a victim. These investigations began with a media narrative.

**Common Pattern—Escalation Rather Than Resolution**

118. All three of the Defendant agencies in question followed a similar pattern in taking action against the Plaintiffs: HUD opened an investigation, proposed an unconstitutional conciliation, refused to discuss concerns, terminated conciliation, and then escalated to a formal complaint. ASD opened an investigation, received full responses, did not find any violation, and still refused to close the investigation. The DOJ opened an investigation with the threat of litigation, received a full response, and went silent. None of the investigations has reached a legitimate conclusion. None has resulted in a finding of violation after full consideration of the Plaintiffs' evidence.

**Common Pattern—Compelled Speech and Associational Restrictions**

119. Multiple Defendants demanded that the Plaintiffs explain, justify, or alter protected associational choices. HUD's conciliation agreement compelled speech and restricted associational language. The DOJ's Attachment A demanded that the Plaintiffs justify their membership criteria. But the First Amendment protects the right of private associations to define their own membership criteria without government interference.

**Common Pattern—Targeting Individuals Without Notice**

120. The original HUD investigation letter was addressed only to Wisdom Woods LLC and Eric Orwoll, though it immediately named Return to the Land as the primary subject of the investigation, and included multiple unrelated LLCs in its Request for Information despite these entities not being named Respondents and not having been notified that they were subject to investigation. When the Plaintiffs' counsel twice inquired in writing early in the investigation as to who was under investigation, HUD never responded. Only much later, without any notice to the affected parties, did HUD subsequently list Peter Julius Csere, Scott Thomas Hallowood, Return

to the Land, and two unrelated individuals, as additional Respondents in its draft conciliation agreement. None of these additional parties received an investigation initiation letter, a request for information, or any other notice that they were under investigation before being named as Respondents in the draft conciliation agreement. Two individuals who do not reside in Arkansas and have no connection to any Arkansas real estate were named as Respondents without ever being notified they were under investigation. Global Homestead Solutions LLC and North Arkansas Excavation LLC—service companies that do not sell, rent, or broker real property—were included in a federal housing discrimination investigation without ever being informed they were under investigation.

**Common Pattern — Perpetual Open-Endedness as a Weapon**

121. ASD refuses to close despite admitting no violation. DOJ refuses to respond despite receiving full compliance. Defendant Griffin has maintained an open-ended "review" of RTTL since July 2025—making public statements that stigmatize the Plaintiffs while never informing them of any investigation, never contacting them, and never closing the matter. An investigation that never closes can never be challenged on its merits. An investigation that produces no final agency action is difficult to challenge in court. The perpetual open investigation is a more effective tool of intimidation than an investigation that reaches a conclusion.

**Evidence of Disparate Treatment**

122. Trainor's City Journal article provides direct evidence of disparate treatment. He publicly stated what legitimate enforcement looks like. His enforcement against the Plaintiffs is the opposite.

123. The EPIC Letter—mailed by HUD on the same day as the Plaintiffs' investigation letter, by the same investigator, from the same office—provides uniquely powerful evidence of

disparate treatment because it eliminates the ordinary variables that make comparisons across government enforcement actions difficult. The two letters share the same date (February 12, 2026), the same agency (HUD FHEO), the same contact official (Hugh James McGlincy), the same statutory framework (the Fair Housing Act), and the same ostensible purpose (notifying a target of a housing discrimination investigation). They differ in only one material respect: the identity of the target. The Plaintiffs possess this evidence only because HUD placed the EPIC Letter in the wrong envelope—addressed to Wisdom Woods, LLC in Ravenden, Arkansas rather than to EPIC Real Properties in Plano, Texas. HUD's own clerical error exposed its own disparate treatment.

124. The EPIC Letter demonstrates that HUD possessed and routinely deployed a standardized, procedurally regular template for FHA investigation notifications—one that presumes innocence, informs recipients of their rights, offers conciliation, and explains the investigative process. HUD deliberately departed from that template when it wrote to the Plaintiffs. The departure was not accidental. The RTTL letter was not a different form letter; it was a bespoke accusatory document that deployed scare quotes to delegitimize the Plaintiffs' associational form ("'association'"); accused Plaintiffs of operating "under the guise" of lawful organization; suggested fraudulent conduct based on a tabloid article rather than investigative findings; threatened DOJ referral; demanded expansive document preservation; and disclosed no rights, no process, and no possibility of dismissal.

125. This deliberate departure from HUD's own standardized procedures is evidence of disparate treatment. When an agency abandons its normal, even-handed procedures to target a particular respondent with extraordinary measures, the natural inference is that the agency is motivated by something other than routine law enforcement—in this case, by the viewpoint and identity of the target.

126. The EPIC Letter also corroborates the pattern alleged throughout this Section: the Plaintiffs were not treated as ordinary subjects of a regulatory investigation. They were treated as enemies of the state to be delegitimized, stigmatized, and punished through the investigative process itself. The contrast between the two letters—one procedural and bureaucratic, the other accusatory and punitive—mirrors the broader contrast between how the government treats conventional real estate companies accused of discrimination (with complaints, case numbers, process, and rights) and how it treated the Plaintiffs (with no complaint, no case number, no process, and no rights). That this evidence reached the Plaintiffs only through HUD's own mailing error—the agency inadvertently exposing its own discriminatory conduct—is a fact from which a factfinder may draw an adverse inference about the care and legitimacy with which HUD conducted its investigation of the Plaintiffs.

**Coordination or Convergent Animus**

127. The commonalities are too numerous for coincidence. Common origin (same media trigger). Common targets (RTTL, Wisdom Woods LLC, Orwoll, Csere). Common timing (ASD second request and HUD investigation initiated the same day: February 12, 2026). Common legal theory (applying fair housing/securities laws to PMA membership criteria). Common trajectory (no findings of violation after full responses). Whether the mechanism is explicit coordination or convergent animus, the result is a multi-front government campaign that punishes the Plaintiffs for protected conduct through investigation itself.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

128. The Plaintiffs have pursued all remedies available within the administrative processes. To the extent any remain, they are futile, inapplicable to constitutional claims, and cannot provide the relief Plaintiffs seek.

129. Constitutional claims against state actors under § 1983 are not subject to administrative exhaustion. *Patsy v. Board of Regents*, 457 U.S. 496, 516 (1982).

130. The same principle applies to constitutional claims for equitable relief against federal officers. *McCarthy v. Madigan*, 503 U.S. 140, 147–49 (1992). The HUD ALJ process cannot adjudicate whether HUD's own investigation violates the Constitution. Only this Court can provide the constitutional remedies Plaintiffs seek.

131. Plaintiffs cooperated fully, produced all requested documents, engaged with the proposed conciliation agreement, identified concerns, requested a discussion, were denied that discussion, and had the process terminated by HUD. Plaintiffs cannot be required to exhaust a process HUD itself foreclosed.

132. HUD has demonstrated it will not engage in good-faith resolution. An agency that refuses a telephone call, mischaracterizes that refusal by ignoring the agency's own culpability in giving counsel legitimate concerns, and terminates conciliation based on the mischaracterization has demonstrated that further engagement would be futile. *McCarthy v. Madigan*, 503 U.S. 140, 146–49 (1992) (exhaustion may be excused where administrative remedy is inadequate, futile, or where agency has predetermined the issue).

133. With respect to ASD, there is no process to exhaust — ASD admits no action is planned yet refuses to close. With respect to DOJ, exhaustion is impossible because DOJ refuses to communicate.

134. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. Requiring Plaintiffs to endure months or years of administrative proceedings while their constitutional rights are violated daily would render judicial relief an empty formality.

135. The constitutional claims are not APA claims and are not subject to APA finality requirements. HUD's termination of conciliation constitutes final agency action because it marks the consummation of HUD's conciliation decision making and determines legal obligations.

136. ASD's refusal to close its investigation after admitting no enforcement action is contemplated similarly constitutes final agency action, or alternatively is reviewable under the APA's waiver of sovereign immunity for non-monetary relief, 5 U.S.C. § 702.

137. DOJ's failure to respond for more than four weeks while keeping the investigation open constitutes agency action unreasonably delayed under 5 U.S.C. § 706(1).

138. Agency action that chills First Amendment rights is reviewable without awaiting further proceedings. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149–54 (1967), overruled in part on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

139. Even setting aside the exhaustion and finality analysis above, Plaintiffs need not await the conclusion of any Defendant's investigation, any enforcement action, or any referral to demonstrate a present, concrete Article III injury sufficient to proceed in this Court now.

140. In *First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. ___, No. 24-781 (Apr. 29, 2026), the Supreme Court held, unanimously, that a nonprofit organization suffered a present *First Amendment* injury from a state attorney general's investigatory subpoena demanding donor information, even though the subpoena was "non-self-executing" and no court had yet ordered compliance. The Court explained that an official investigatory demand "inevitably" deters the exercise of associational and expressive rights for as long as it remains outstanding, regardless of whether or when it is ultimately enforced, and that a recipient of such a demand need not wait for enforcement, or for parallel proceedings to conclude, before seeking relief in federal court. *Id.*

141. The same reasoning applies here with at least equal force, and to every Defendant's investigation.

142. HUD's and DOJ's document demands require Plaintiffs to disclose, among other things, RTTL's membership criteria, Land Association information, and the identities and beliefs of individuals associated with Plaintiffs' protected activities — information whose compelled disclosure this Court's and the Supreme Court's precedents have long recognized as a direct burden on associational freedom.

143. ASD's demand for membership and investment information from Wisdom Woods LLC and Allegory Acres LLC carries the same associational burden. None of these demands has been formally enforced through a court order, and HUD's investigation has not proceeded to a final ALJ determination, DOJ has not yet filed suit, and ASD has neither closed its file nor initiated a formal enforcement proceeding — but under *First Choice*, that is precisely the posture in which a chilling injury is most in need of, and most amenable to, present judicial review, because the injury exists as long as the demand remains outstanding, not only once it is enforced.

144. *First Choice* forecloses any argument that Plaintiffs must wait for HUD's Secretary-Initiated Complaint to reach an Administrative Law Judge, for DOJ to decide whether to sue under 42 U.S.C. § 3614(a), or for ASD to either close its file or commence a formal proceeding, before this Court may adjudicate the constitutional injury that the pendency of these investigations is already inflicting on Plaintiffs.

145. As in *First Choice,* Plaintiffs' inability to guarantee members, prospective members, and donors that their identifying and associational information will not be compelled from Plaintiffs and disclosed to the government has already deterred, and continues to deter, individuals from associating with Plaintiffs, exactly the kind of present, ongoing injury *First Choice* held

sufficient to proceed. First Choice, 608 U.S. ___, slip op. at 10–13.

## CLAIMS FOR RELIEF

### COUNT I

### First Amendment Retaliation

### (Against All Individual Defendants in Their Official Capacities)

146. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

147. The First Amendment prohibits government officials from retaliating against individuals for exercising their rights of speech, association, and petition.

148. The Plaintiffs engaged in constitutionally protected activity: forming and maintaining a private membership association organized around shared values and cultural heritage; publicly advocating for homesteading, intentional communities, and private association rights; and defining membership criteria based on shared cultural heritage.

149. Each Defendant took adverse action that would chill a person of ordinary firmness from continuing protected activity.

150. There is a causal connection between the Plaintiffs' protected activity and the adverse actions.

151. The Defendants lacked any legitimate, non-retaliatory basis.

152. The absence of legitimate purpose, combined with affirmative evidence of disparate treatment establishes that Defendants were motivated by viewpoint animus.

### COUNT II

### Conspiracy to Violate Civil Rights

### 42 U.S.C. § 1983 / 42 U.S.C. § 1985(3)

**(Against All Individual Defendants in Their Official Capacities)**

153. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

154. 42 U.S.C. § 1985(3) creates a cause of action against persons who "conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." Section 1983 provides a cause of action against persons acting under color of law who deprive any person of constitutional rights.

155. The Defendants reached an agreement or meeting of the minds—whether explicit or tacit—to target the Plaintiffs with coordinated investigations designed to punish protected speech and association. The existence of an agreement is supported by common origin in the same media coverage; common targets; common timing (ASD second request and HUD investigation initiated the same day); common legal theory; common pattern of investigation-without-complaint and escalation-without-resolution.

156. Alternatively, even absent explicit agreement, the Defendants' actions exhibit convergent animus—each independently responding to the same media trigger by pursuing the same targets using the same tactics for the same improper purpose.

157. The Defendants committed overt acts in furtherance of the conspiracy.

158. The conspiracy was motivated by class-based, invidiously discriminatory animus. The Plaintiffs are members of a class defined by race (white/European heritage). The investigations target the Plaintiffs because RTTL's membership criteria reference European heritage, and media coverage portrayed RTTL as "whites-only." The government would not subject a Black, Hispanic, Jewish, or Muslim intentional community to the same multi-agency campaign. Dozens of ethnically and religiously defined communities operate openly without the same scrutiny or

harassment.

159. In the alternative, the conspiracy was motivated by animus against the Plaintiffs' political viewpoint and First Amendment associational rights, which the Eighth Circuit has recognized may support § 1985(3) liability in appropriate circumstances. *Federer v. Gephardt*, 363 F.3d 754, 757–58 (8th Cir. 2004).

160. As a direct and proximate result, the Plaintiffs have been deprived of their rights to free speech, free association, due process, and equal protection.

**COUNT III**

**Equal Protection—Selective Enforcement**

**(Against All Individual Defendants in Their Official Capacities)**

161. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

162. The Equal Protection Clause of the Fourteenth Amendment, applicable to the federal government through the Fifth Amendment's Due Process Clause, prohibits selective enforcement based on arbitrary or discriminatory classifications.

163. The Plaintiffs are similarly situated to dozens of other private membership associations and intentional communities that define membership by race, ethnicity, or religion yet none has been subjected to similar investigation, scrutiny, or application of law.

**COUNT IV**

**Compelled Speech — First Amendment**

**(Against HUD Defendants in Their Official Capacities)**

164. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

165. The First Amendment prohibits the government from compelling private speech. The unconstitutional conditions doctrine separately prohibits the government from conditioning a benefit or the termination of an investigation on the surrender of a constitutional right. The government also may not use regulatory or enforcement leverage to coerce third parties into punishing or suppressing disfavored speech.

166. The HUD conciliation agreement demanded compelled speech in violation of the First Amendment.

**COUNT V**

**Due Process—Fifth and Fourteenth Amendments**

**(Against HUD Defendants and ASD Defendants in Their Official Capacities)**

167. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

168. The Due Process Clause requires fair notice before the government imposes burdens on individual rights. The original HUD investigation was addressed only to Wisdom Woods LLC and Eric Orwoll yet immediately named Return to the Land as the primary subject of the investigation. Without any notice, Global Homesteads Solutions LLC and North Arkansas Excavation LLC were included in HUD's subsequent Request for Information, despite not being named Respondents. Continuing in this manner, HUD added Peter Julius Csere, Scott Thomas Hallowood, and two other individuals to the draft of the conciliation agreement as additional Respondents. None of these parties received an investigation initiation letter or any other notice before being named as Respondents subject to obligations including payment into a $40,000 Compensation Fund, submission to government monitoring, and alteration of their speech and association. Among those added without notice were two citizens of different states with no

connection to any Arkansas real estate. Additionally, Global Homestead Solutions LLC and North Arkansas Excavation LLC are service companies that do not sell, rent, or broker real property and had no reason to believe they were subjects of a federal housing discrimination investigation. When the Plaintiffs' counsel inquired in writing as to who was under investigation early on in the course of the investigation, HUD did not respond. Adding parties to a settlement agreement without prior notice and without giving those persons a chance to participate in the investigation violates the most basic requirements of procedural due process.

169. An open government investigation imposes significant burdens: reputational harm combined with alteration of legal rights or status, ongoing document preservation obligations, legal uncertainty that precludes the Plaintiffs from representing to third parties that the matter is resolved, and the concrete chilling of constitutionally protected speech and association. ASD's investigation, opened without complaint, has run nearly nine months. Joslin admitted no administrative action is planned and no further information is needed. Yet ASD refuses to close the investigation or provide written confirmation. An investigation the agency admits reveals no violation, yet refuses to close, serves no legitimate purpose. It serves only to punish, stigmatize, chill, and burden. This is a penalty imposed without hearing, without findings, without any avenue for closure. ASD's tactic also violates due process by evading judicial review. An investigation that never results in final agency action is difficult to challenge. By refusing to close while disclaiming enforcement intent, ASD has placed the Plaintiffs in a due process no-man's-land.

**COUNT VI**

**Declaratory Judgment — 28 U.S.C. §§ 2201–2202**

**(Against All Defendants)**

170. The Plaintiffs reallege and incorporate by reference each and every allegation set forth

in the preceding paragraphs.

171. An actual controversy exists between the Plaintiffs and each of the Defendants. The Plaintiffs contend the investigations violate the Constitution. The Defendants, by pursuing them, contend otherwise. The controversy is ripe, the issues are fit for judicial decision, and the Plaintiffs suffer ongoing harm.

172. The Plaintiffs are entitled to declarations that: (a) the FHA does not apply to RTTL's membership criteria, internal governance, or associational activities because RTTL does not sell, rent, broker, or otherwise make available dwellings, and RTTL's internal membership decisions are not "real estate-related transactions"; (b) RTTL's membership criteria are protected by the First Amendment right of expressive association, and RTTL qualifies as a bona fide private membership association whose internal membership decisions are not subject to the Fair Housing Act; (c) the HUD conciliation agreement's compelled speech provisions violate the First Amendment; (d) the Secretary-initiated investigation violates the First Amendment, Due Process Clause, and Equal Protection; (e) ASD's indefinite open investigation violates due process; (f) DOJ's indefinite open investigation violates due process; (g) Cameron's official statement violates the First Amendment; (h) media coverage, public commentary, political characterizations, and alleged ideology cannot substitute for the statutory elements of a discriminatory housing transaction, and the government may not premise an investigation or enforcement action on such characterizations absent evidence of an actual regulated transaction; (i) RTTL's membership process is legally distinct from Wisdom Woods, LLC's property ownership and governance, and the government may not collapse these separate entities into a single housing-discrimination theory absent evidence that RTTL itself engaged in a regulated real estate transaction.

## COUNT VII

### Violation of the Administrative Procedure Act — 5 U.S.C. § 706

### (Against DOJ and HUD in Their Official Capacities)

173. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

174. The APA authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (§ 706(2)(A)), "contrary to constitutional right" (§ 706(2)(B)), or "in excess of statutory jurisdiction" (§ 706(2)(C)), and to "compel agency action unlawfully withheld or unreasonably delayed" (§ 706(1)).

175. HUD's Secretary-initiated investigation and conversion to formal complaint constitute agency action that is: (a) contrary to constitutional right (§ 706(2)(B)) because the investigation violates the First Amendment, Due Process Clause, and Equal Protection; (b) in excess of statutory authority (§ 706(2)(C)) because the FHA does not authorize investigations of private membership associations that do not engage in real estate transactions, and the Secretary-initiated mechanism was not intended to target small homesteading communities without any complaint; (c) arbitrary and capricious (§ 706(2)(A)) because it relies on outdated evidence, disregards exculpatory findings, proposes unconstitutional remedies, and was terminated in bad faith.

176. The DOJ's investigation and failure to respond constitute agency action that is: (a) contrary to constitutional right (§ 706(2)(B)); (b) arbitrary and capricious (§ 706(2)(A)) because the DOJ opened the investigation based on media-driven animus and went silent after receiving full compliance; (c) unreasonably delayed (§ 706(1)) because the DOJ has failed to respond for more than four weeks since receiving the Plaintiffs' submission while keeping the investigation open. The DOJ's complete failure to communicate or act for more than four weeks after receiving

the Plaintiffs' comprehensive submission—in an investigation opened with the explicit threat of federal litigation—constitutes unreasonable delay, where the investigation itself chills constitutionally protected activity.

## COUNT VIII

## Abuse of Process

## (Against All Defendants)

177. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

178. The Government investigations may not be used for improper purposes. When government actors initiate and pursue investigations not to enforce the law but to punish protected constitutional activity, they abuse the legal process.

179. The Defendants abused the investigative process by opening investigations without complaints; pursuing investigations despite exculpatory evidence; demanding unconstitutional remedies; refusing to engage with the Plaintiffs' responses; escalating when Plaintiffs sought dialogue (HUD); keeping investigations open after admitting no violation (ASD); going silent after receiving full compliance (DOJ); and using the investigative process itself as punishment.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court grant the following relief:

### A. Declaratory Relief

a. A declaratory judgment that the Fair Housing Act does not apply to RTTL's membership criteria, internal governance, or associational activities because RTTL does not sell, rent, broker, or otherwise make available dwellings within the meaning of the Act;

b. A declaratory judgment that RTTL's membership criteria are protected by the First

Amendment right of expressive association and that RTTL is a bona fide private membership association whose internal membership decisions are not subject to the Fair Housing Act because RTTL does not itself provide, offer, sell, rent, broker, or otherwise make available dwellings or real estate;

c. A declaratory judgment that the compelled speech provisions of the HUD conciliation agreement violate the First Amendment;

d. A declaratory judgment that the Secretary-initiated investigation of Plaintiffs (HUD Inquiry 869910), in the absence of any underlying complaint and in the presence of evidence of viewpoint-based selective enforcement, violates the First Amendment, the Due Process Clause, and the Equal Protection guarantee;

e. A declaratory judgment that the indefinite maintenance of an open securities investigation by ASD after ASD has admitted it plans no administrative action violates the Due Process Clause;

f. A declaratory judgment that the DOJ's indefinite maintenance of an open investigation without responding to the Plaintiffs' submission, while the Plaintiffs remain under document preservation obligations and threat of litigation, violates the Due Process Clause;

g. A declaratory judgment that Defendant Cameron's July 29, 2025, official statement violates the First Amendment;

h. A declaratory judgment that media coverage, public commentary, political characterizations, and alleged ideology cannot substitute for the statutory elements of a discriminatory housing transaction under the Fair Housing Act, and that the government may not premise an investigation or enforcement action on such characterizations absent evidence of an actual sale, rental, or other regulated real estate transaction;

i. A declaratory judgment that RTTL's membership process is legally distinct from Wisdom Woods, LLC's property ownership and governance, that a rejected application for membership in RTTL does not by itself constitute a denied dwelling sale, rental, or other real estate transaction, and that the government may not collapse RTTL and Wisdom Woods, LLC into a single housing-discrimination theory absent evidence that RTTL itself engaged in a regulated real estate transaction.

**B. Injunctive Relief**

a. A permanent injunction directing HUD to terminate the Secretary-initiated investigation (Inquiry 869910) and the Secretary-Initiated Complaint against the Plaintiffs;

b. A permanent injunction directing HUD to refrain from demanding compelled speech, associational language restrictions, or advertising of compensation funds in any conciliation or settlement;

c. A permanent injunction directing the DOJ to close its investigation (DJ# 175-9-147);

d. A permanent injunction directing ASD to close its investigation and provide written confirmation within fourteen days;

e. A permanent injunction directing Defendant Cameron to retract his July 29, 2025, statement and to refrain from issuing official statements condemning the Plaintiffs based on media reports;

f. A permanent injunction prohibiting all Defendants from opening new investigations of Plaintiffs based on the same facts, theories, or media coverage that gave rise to the investigations challenged in this action;

g. A permanent injunction prohibiting all Defendants from adding individuals to investigations without prior written notice and an opportunity to respond.

**C. Other Relief**

a. Retention of jurisdiction to ensure compliance;

b. Attorneys' fees and costs under 42 U.S.C. § 1988(b), 28 U.S.C. § 2412 (EAJA), and any other applicable provisions;

c. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

The Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: August 20, 2026

**[SIGNATURE ON FOLLOWING PAGE]**

Respectfully submitted,

Jonathan Gross (MD Bar ID: 1912170138)
LAW OFFICE OF JONATHAN GROSS
2833 Smith Ave., Suite 331
Baltimore, MD 21209
(443) 813-0141
jon@jonathangross.law

*Attorney for Plaintiffs*