**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| ERIC ORWOLL; PETER JULIUS CSERE; SCOTT THOMAS HALLOWOOD; WISDOM WOODS LLC, an Arkansas limited liability company; GLOBAL HOMESTEAD SOLUTIONS LLC, an Arkansas limited liability company; NORTH ARKANSAS EXCAVATION LLC, an Arkansas limited liability company; ALLEGORY ACRES LLC, an Arkansas limited liability company; and RETURN TO THE LAND, an unincorporated private membership association, | ) | |
| Plaintiffs, | ) | Case No. 3:26-cv-00239-BSM |
| v. | ) | |
| UNITED STATES DEPARTMENT OF JUSTICE; HARMEET K. DHILLON, in her official capacity as Assistant Attorney General, Civil Rights Division; CARRIE PAGNUCCO, in her official capacity as Chief, Housing and Civil Enforcement Section; KATIE LEGOMSKY, in her official capacity as Trial Attorney; SHANNON SMITH, in her official capacity as Civil Chief, U.S. Attorney's Office, Eastern District of Arkansas; JONATHAN D. ROSS, in his official capacity as United States Attorney for the Eastern District of Arkansas; | ) | |

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; CRAIG TRAINOR, in his official capacity as Assistant Secretary for Fair Housing and Equal Opportunity; LON D. MELTESEN, in his official capacity as Director, Office of Special Investigations; HUGH JAMES McGLINCY, in his official capacity as Investigator, Office of Special Investigations; ROBERT A. DOLES, in his official capacity as Acting Deputy Assistant Secretary for Enforcement; )

SUSANNAH MARSHALL, in her official capacity as Arkansas Securities Commissioner; JOE JOSLIN, in his official capacity as Associate General Counsel; )

TIM GRIFFIN, in his official capacity as Attorney General of Arkansas, )

DAVID CAMERON, in his official capacity as City Manager, Springfield, Missouri; )

Defendants.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Eric Orwoll, Peter Julius Csere, Scott Thomas Hallowood, Wisdom Woods LLC, Global Homestead Solutions LLC, North Arkansas Excavation LLC, Allegory Acres LLC, and Return to the Land (collectively, the "Plaintiffs"), by and through their undersigned counsel, for their Complaint against the above-named Defendants, state as follows:

# I. NATURE OF THE ACTION

1. This action challenges a coordinated campaign of government retaliation against the Plaintiffs for exercising their First Amendment rights of speech, association, and assembly. Beginning in July 2025, multiple government agencies—U.S. federal, state, and local—opened investigations targeting the Plaintiffs not because of any evidence of unlawful conduct, but because of media coverage portraying the Plaintiffs' private membership association as a "whites-only" real estate development. Each investigation was initiated without a complaint from an actual legitimate victim. Each investigation has been pursued despite exculpatory evidence. And each investigation has either been escalated (by the U.S. Department of Housing and Urban Development), left perpetually open without resolution (by the Arkansas Securities Department), or abandoned into silence without closure (by the U.S. Department of Justice). The investigations themselves—not their outcomes—are the punishment.

1(a). The investigations produce two distinct injuries. First, Global Homestead Solutions LLC, North Arkansas Excavation LLC, and Allegory Acres LLC were investigated although none could have issued a security: the first two are single-member companies with no membership interests to sell, and the third has eight founding members who acquired their interests at formation (for shared ownership and use rather than for investment), but it never acquired land, never publicly announced a plan to acquire land, and never sold a membership interest. The investigation of the three had no securities subject. Second, the investigations of Wisdom Woods LLC and Return to the Land remain open although the agencies have concluded that no violation occurred. The Arkansas Securities Department's examining attorney told Plaintiffs' counsel in July 2026 that no administrative action was planned and no further information was needed; the Department then refused to close the file or confirm that in writing. The Department of Justice has not responded to Plaintiffs' July 13, 2026 submission at all. The injury is the pendency of the files.

1(b). The Supreme Court has held that an official demand burdens First Amendment rights "when it is made and for as long as it remains outstanding," whether or not it is enforced. *First Choice Women's Resource Ctrs., Inc. v. Davenport*, 608 U.S. 174, 189 (2026).

2. The Plaintiffs are members and leaders of Return to the Land ("RTTL"), a nationwide unincorporated private membership association, and Wisdom Woods LLC, an Arkansas limited liability company that owns approximately 158 acres of land near Ravenden, Sharp County, Arkansas, where approximately forty people reside in a homesteading and agricultural community. The Plaintiffs' associational and expressive activities are protected by the First Amendment.

3. On July 21, 2025, Sky News published a documentary about RTTL containing fabricated evidence—including a digitally created photograph of a tree bearing the words "WHITES ONLY" that does not and has never existed on the property—and misleading editing designed to portray Plaintiffs' community as a "fortress for the white race." The documentary triggered a cascade of media coverage, which in turn triggered a cascade of government investigations.

4. On July 29, 2025, Defendant David Cameron, City Manager of Springfield, Missouri, issued an official statement on a .gov website—and therefore under color of law—condemning RTTL based solely on "media reports" while admitting "no one from this group has contacted the City directly." Cameron declared that "we will not stand idly by"—an official threat of government action against an organization that had never contacted his city, based on media reports that he never verified.

5. The Arkansas Securities Department ("ASD") opened an investigation in October 2025. After nearly nine months of document production and responses, Defendant Joe Joslin, the examining attorney, stated by telephone in or about July 2026 that ASD did not plan to take any administrative action and did not plan to request any additional information. Mr. Joslin stated over the phone that ASD intended to change the status of the investigation from that of an active investigation to one of monitoring the situation because ASD was aware of other litigation

involving the Plaintiffs in Sharp County, Arkansas. ASD refused to formally close the investigation even though ASD found no reason to pursue any alleged violations of Arkansas securities laws. The Plaintiffs remain under an indefinitely open securities investigation that the agency itself concedes reveals no violation.

6. On February 12, 2026, the U.S. Department of Housing and Urban Development ("HUD") opened a Secretary-initiated investigation under 42 U.S.C. § 3610(a)(1)(A)(iii)—a mechanism that bypasses the normal complaint process and does not require an underlying victim. HUD pursued that investigation for months without ever making a specific factual allegation that amounted to a statutory violation despite counsel to the Plaintiffs expressly asking HUD to articulate such a theory that the Plaintiffs could defend against. Then, on July 2, 2026, HUD proposed a draft conciliation agreement demanding: (i) a $40,000 "Compensation Fund" to be advertised by the Plaintiffs at their own expense and distributed by HUD with no independent oversight; (ii) a $10,000 civil penalty; (iii) three years of government monitoring; (iv) government-compelled speech on the Plaintiffs' inherently expressive social media platforms; and (v) restrictions on Plaintiffs' use of the word "community." No individual has ever made a factually supported claim of housing discrimination against RTTL. The Compensation Fund has no legitimate claimant.

7. Defendant Craig Trainor, HUD's Assistant Secretary for Fair Housing and Equal Opportunity, published an article in City Journal on April 28, 2026, titled "Let's Make Civil Rights Enforcement Constitutional Again," in which he publicly stated that HUD "is a federal law enforcement agency, not a social-justice NGO," that enforcement should target "intentional discrimination," that the Fair Housing Act "must not be enforced in a manner that infringes on the free speech," and that HUD must "return to the text of the Fair Housing Act." Trainor also condemned "a racial spoils system that doles out rewards to favored constituencies." Two months later, Trainor purported to represent HUD as the named "Complainant" and signatory on behalf of

HUD on the draft conciliation agreement that demanded compelled speech, a $40,000 compensation fund with no legitimate claimant, and restrictions on associational language. The contradiction between Trainor's public statements and his enforcement conduct is a glaring example of HUD's disparate treatment of the Plaintiffs.

8. On August 4, 2026, when the Plaintiffs' counsel requested a telephone call to discuss high-level concerns about the conciliation agreement before negotiating finer points—a routine professional courtesy—HUD Investigator Hugh James McGlincy refused the call and unilaterally terminated conciliation, converting the investigation to a formal Secretary-Initiated Complaint. The Plaintiffs did not refuse to conciliate. Plaintiffs asked to discuss their concerns. HUD refused to listen.

9. Simultaneously, during the course of HUD's investigation, on June 4, 2026, the U.S. Department of Justice (the "DOJ"') opened a parallel investigation under the Fair Housing Act, explicitly citing the Attorney General's authority to file federal litigation directly under 42 U.S.C. § 3614(a). The investigation letter was signed by Defendant Harmeet K. Dhillon, Assistant Attorney General for Civil Rights. The Plaintiffs filed a comprehensive response on July 13, 2026. As of the date of this filing, the DOJ has not responded to Plaintiffs' submission, and the leadership of the Civil Rights Division has not responded to multiple meeting requests or communicated with the Plaintiffs in any manner. The DOJ investigation, like the ASD investigation, remains open indefinitely, without resolution or communication.

10. These actions are not isolated. They share a common origin (media coverage of RTTL), a common pattern (investigation without underlying complaint, pursuit despite exculpatory evidence, escalation or perpetual open-endedness rather than resolution), and a common effect (chilling the Plaintiffs' First Amendment rights, stigmatizing the Plaintiffs, and imposing ongoing legal burdens without any legitimate law enforcement purpose). The Defendants have engaged in

a campaign to punish the Plaintiffs for their protected speech and association through the mechanism of government investigation itself.

11. This action seeks only declaratory and injunctive relief. The Plaintiffs do not seek compensatory or punitive damages. The Plaintiffs seek: (i) a declaration that Defendants' investigations violate the First Amendment, the Due Process Clause, and the Equal Protection guarantee; (ii) an injunction terminating the HUD, DOJ, and ASD investigations and requiring Commissioner Marshall to close the Arkansas Securities Department investigation in writing; (iii) an injunction prohibiting compelled speech and associational-language restrictions; (iv) an order directing Defendant Cameron to retract his July 29, 2025 official threat; (v) an injunction prohibiting new investigations of Plaintiffs or the addition of individuals to investigations without notice; and (vi) such other relief as the Court deems just and proper.

12. The Plaintiffs have pursued all remedies available to them. The Plaintiffs fully cooperated with each investigation, produced all requested documents, and engaged in HUD's conciliation process in good faith. HUD, not the Plaintiffs, terminated that process. After HUD converted the matter to a formal complaint, Plaintiffs' counsel submitted a response and requested that HUD hold the proceeding in abeyance on September 8, 2026. HUD has not responded. Any further HUD administrative process would be futile because HUD has refused to engage with Plaintiffs' submissions and has already converted the matter to a complaint. No further administrative remedy is available to the Plaintiffs with respect to the HUD conciliation process because HUD refused to discuss their concerns and converted the matter to a complaint, and because HUD has not responded to their September 8, 2026 request to hold the matter in abeyance. With respect to the Arkansas Securities Department, the Plaintiffs cannot obtain administrative closure because the Department—after its examining attorney stated that no enforcement action was contemplated—refuses to close the investigation or provide written confirmation. With respect to the DOJ investigation, the Plaintiffs cannot obtain administrative resolution because the

leadership of the Civil Rights Division has not responded to the Plaintiffs' July 13, 2026 submission or to multiple meeting requests. To the extent that any administrative remedies remain, they are futile because the agencies have demonstrated bad faith, and they are inapplicable to the constitutional claims asserted here.

## II. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the First, Fifth, and Fourteenth Amendments; the Administrative Procedure Act, 5 U.S.C. §§ 702–06; and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985(3).

14. Sovereign immunity does not bar this action against the federal Defendants. Section 702 of the Administrative Procedure Act, 5 U.S.C. § 702, waives immunity for actions seeking relief other than money damages that state a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority. The Plaintiffs seek relief "other than money damages." *Id.* § 702. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, and it has authority to grant equitable relief against federal officers for constitutional violations under its inherent equitable authority.

14(a). Section 702's waiver extends to the federal officers sued here, and sovereign immunity does not bar prospective relief against them for unconstitutional or ultra vires conduct. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–91 (1949); *Dugan v. Rank*, 372 U.S. 609, 620–22 (1963); *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015).

15. This Court has jurisdiction over the claims against the State and local Defendants under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), because those claims arise under the Constitution and under 42 U.S.C. § 1983.

16. Venue is proper in the Eastern District of Arkansas under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Sharp County, Arkansas, which is within this District. The investigations target an Arkansas community, Arkansas residents, and Arkansas entities, and the individual Plaintiffs reside in Sharp County. Venue is also proper as to the federal Defendants under 28 U.S.C. § 1391(e)(1)(C) because the Plaintiffs reside in this District and no real property is involved in this action. The action challenges government investigations and demands, not title to or possession of real property.

## III. PARTIES

### Plaintiffs

17. Plaintiff Eric Orwoll is a citizen of Arkansas, residing in Ravenden, Sharp County, Arkansas. He is a co-founder of RTTL and a resident of the property owned by Wisdom Woods LLC. He was the primary interview subject in the Sky News documentary and is a named addressee on the DOJ and HUD investigation correspondence.

18. Plaintiff Peter Julius Csere is a citizen of Arkansas, residing in Ravenden, Sharp County, Arkansas. He is a co-founder of RTTL, a managing member of Wisdom Woods LLC, and a resident of the property owned by Wisdom Woods LLC. He was interviewed in the Sky News documentary and is a named addressee on the DOJ investigation correspondence. He was subsequently added as a Respondent in the HUD investigation and conciliation agreement without prior notice that he was under investigation.

19. Plaintiff Scott Thomas Hallowood is a citizen of Arkansas, residing in Ravenden, Sharp County, Arkansas. He is a member of RTTL, is a resident of the property owned by Wisdom Woods LLC, and was interviewed in the Sky News documentary. He was added as a Respondent in the HUD investigation and conciliation agreement without prior notice that he was under investigation.

20. Plaintiff Wisdom Woods, LLC is an Arkansas limited liability company that owns approximately 158 acres near Ravenden, Sharp County, Arkansas, and has approximately thirty-one (31) members. The limited liability company agreement of Wisdom Woods, LLC is an expense-sharing agreement among a group of families who purchased land together for homesteading, agriculture, and rural living. Wisdom Woods, LLC is a separate legal entity from RTTL, with separate governance, separate membership criteria, and separate financial operations. It does not advertise, does not solicit members from the general public, and does not maintain any public-facing online presence. It is a named addressee on the DOJ investigation letter, the HUD request for information, and the HUD conciliation agreement, and it is subject to the ASD investigation.

21. Plaintiff Global Homestead Solutions LLC is an Arkansas limited liability company. Plaintiff Peter Julius Csere is its sole member. It provides construction and handyman services. Global Homestead Solutions LLC was included in the ASD investigation and named in HUD's February 20, 2026, document preservation demand despite having no apparent connection to any securities offering or housing transaction. It does not sell, rent, or broker real property and does not offer or sell securities. Its inclusion in these investigations exemplifies the overbroad and indiscriminate scope of the government actions challenged in this Complaint.

21(a). Global Homestead Solutions LLC has no members other than Mr. Csere and has never issued, offered, or sold a membership interest to any person.

22. Plaintiff North Arkansas Excavation LLC is an Arkansas limited liability company. Plaintiff Scott Thomas Hallowood is its sole member. It provides excavation services. North Arkansas Excavation LLC was included in the ASD investigation and named in HUD's February 20, 2026, document preservation demand despite having no apparent connection to any securities offering or housing transaction. It does not sell, rent, or broker real property and does not offer or

sell securities. Its inclusion in these investigations exemplifies the overbroad and indiscriminate scope of the government actions challenged in this Complaint.

22(a). North Arkansas Excavation LLC has no members other than Mr. Hallowood and has never issued, offered, or sold a membership interest to any person.

23. Plaintiff Allegory Acres LLC is an Arkansas limited liability company. It was included in the ASD investigation despite the anonymous complainant having no information about the entity other than the names of certain individuals associated with it. ASD opened an investigation into whether membership interests in Allegory Acres LLC constitute "investment contracts" under the Arkansas Securities Act without conducting any independent due diligence or verifying whether the entity was engaged in any activity subject to the Act. Allegory Acres LLC does not offer or sell securities and does not transact business with the public. It was included in the ASD investigation and named in HUD's February 20, 2026, document preservation demand despite having no apparent connection to any housing transaction. Its inclusion in these investigations exemplifies the overbroad and indiscriminate scope of the government actions challenged in this Complaint.

23(a). Allegory Acres LLC has eight founding members who acquired their interests at formation (for shared ownership and use rather than for investment). It never acquired land, never publicly announced a plan to acquire land, and never sold a membership interest.

24. Plaintiff Return to the Land ("RTTL") is a nationwide unincorporated private membership association with over 1,000 members. It is not a legal entity. Its primary activity is hosting social events and meetups for its members. RTTL does not own, sell, rent, lease, or otherwise make available any real estate or dwellings to its members. RTTL does not own or control any corporations, limited liability companies, or other business entities. It is separate from Wisdom Woods LLC, with separate governance, membership, and operations. RTTL is a named addressee on the DOJ investigation letter. Inaccurate media coverage of RTTL, and the intentional

mischaracterization of its First Amendment-protected public communications, are the primary basis for the government investigations challenged herein.

**Defendants**

**Department of Justice Defendants**

25. The Defendant U.S. Department of Justice opened an investigation into Plaintiffs on June 4, 2026, under the Fair Housing Act, DJ# 175-9-147, through its Civil Rights Division, Housing and Civil Enforcement Section. The Plaintiffs are suing the DOJ in its official capacity for declaratory and injunctive relief.

26. Defendant Harmeet K. Dhillon is the Assistant Attorney General for Civil Rights. She signed the June 4, 2026, investigation letter citing the Attorney General's litigation authority under 42 U.S.C. § 3614(a). The Plaintiffs are suing Assistant Attorney General Dhillon in her official capacity.

27. Defendant Carrie Pagnucco is the Chief of the Housing and Civil Enforcement Section. Her name appears as approving official on the June 4, 2026, investigation letter, and she approved the letter that opened the DOJ investigation of Plaintiffs. The Plaintiffs are suing Ms. Pagnucco in her official capacity.

28. Defendant Katie Legomsky is a Trial Attorney in the Housing and Civil Enforcement Section and the DOJ attorney identified as the contact person in the June 4, 2026, investigation letter. Plaintiffs served their July 13, 2026 response in the investigation, and DOJ has not responded. The Plaintiffs are suing Ms. Legomsky in her official capacity.

29. Defendant Shannon Smith is the Civil Chief of the U.S. Attorney's Office for the Eastern District of Arkansas. The June 4, 2026 investigation letter was copied to her as Civil Chief, and she is the U.S. Attorney's Office official responsible for civil enforcement in this district. The Plaintiffs are suing Ms. Smith in her official capacity.

30. Defendant Jonathan D. Ross is the U.S. Attorney for the Eastern District of Arkansas. On information and belief, the anonymous complaint regarding RTTL was sent to his office, and the June 4, 2026 investigation letter was copied to his Civil Chief. The Plaintiffs are suing Mr. Ross in his official capacity for declaratory and injunctive relief.

**Department of Housing and Urban Development Defendants**

31. The Defendant U.S. Department of Housing and Urban Development ("HUD") opened a Secretary-initiated investigation into the Plaintiffs on February 12, 2026 (HUD Inquiry 869910), through its Office of Fair Housing and Equal Opportunity, Office of Special Investigations, and subsequently converted it to a Secretary-Initiated Complaint. The Plaintiffs are suing HUD in its official capacity for declaratory and injunctive relief.

32. Defendant Scott Turner is the Secretary of HUD. The investigation is "Secretary-initiated" under 42 U.S.C. § 3610(a)(1)(A)(iii) and was opened under his ultimate authority. The Plaintiffs are suing Secretary Turner in his official capacity.

33. Defendant Craig Trainor is the Assistant Secretary for Fair Housing and Equal Opportunity at HUD and the named "Complainant" in the draft conciliation agreement prepared by HUD. The Plaintiffs are suing Assistant Secretary Trainor in his official capacity.

34. On information and belief, Defendant Lon D. Meltesen is the Director of the Office of Special Investigations, FHEO, HUD, and the approval signatory on the July 2, 2026, conciliation agreement. The Plaintiffs are suing Director Meltesen in his official capacity.

35. Defendant Hugh James McGlincy is an Investigator in the Office of Special Investigations and the day-to-day contact for the HUD investigation. On information and belief, prior to the appointment of Mr. Meltesen, Mr. McGlincy served as the Acting Director of the Office of Special Investigations. He sent the August 4, 2026, email refusing the Plaintiffs' conciliation discussion request and converting the investigation to a formal complaint. The Plaintiffs are suing Mr. McGlincy in his official capacity.

36. Defendant Robert A. Doles is the Acting Deputy Assistant Secretary for Enforcement, FHEO, HUD. He signed the initial investigation letter (February 12, 2026) and the request for information cover letter (February 20, 2026). The Plaintiffs are suing Acting Deputy Assistant Secretary Doles in his official capacity.

**Arkansas Securities Department Defendants**

37. The Arkansas Securities Department is an agency of the State of Arkansas. It opened an investigation into the Plaintiffs in October 2025 and has refused to close that investigation despite the examining attorney's statement that no administrative action is planned and no further information is needed. The Department itself is not a defendant; Commissioner Marshall, who controls the investigation, and Mr. Joslin, the examining attorney, are sued in their official capacities.

38. Defendant Susannah Marshall is the Arkansas Securities Commissioner. As Commissioner, she is the head of the Arkansas Securities Department and exercises ultimate authority over its investigations and enforcement actions, including the investigation of the Plaintiffs. The Plaintiffs are suing Commissioner Marshall in her official capacity for declaratory and injunctive relief under § 1983.

38(a). Commissioner Marshall exercises ultimate authority over whether the investigation is closed, and the prospective relief sought runs to her.

39. Defendant Joe Joslin is the Associate General Counsel of the Arkansas Securities Department and the examining attorney for the ASD investigation. He sent the first and second information requests. In or about July 2026, he stated by telephone to the Plaintiffs' counsel that ASD did not plan to take administrative action and did not plan to request additional information, but refused to close the investigation and refused to provide written confirmation. The Plaintiffs are suing Mr. Joslin in his official capacity for declaratory and injunctive relief under § 1983.

39(a). Mr. Joslin signed both information requests and, in July 2026, told Plaintiffs' counsel that no administrative action was planned and no further information was needed.

**State Government Defendant**

40. Defendant Tim Griffin is the Attorney General of Arkansas. Beginning in July 2025, following the Sky News documentary, Defendant Griffin repeatedly stated to media outlets that his office was “reviewing” or “looking into” RTTL, and publicly condemned Plaintiffs’ First Amendment-protected speech and association. He never informed Plaintiffs of any investigation, never contacted Plaintiffs directly, and never issued any findings or closure. By maintaining an open-ended, uncommunicated “review” while making public statements that condemn and stigmatize Plaintiffs’ protected expression, Defendant Griffin—the state’s chief law enforcement officer—has contributed to the campaign of government retaliation against the Plaintiffs for their protected speech and association. The Plaintiffs are suing Attorney General Griffin in his official capacity for declaratory and injunctive relief under § 1983.

40(a). Attorney General Griffin publicly stated that he had "not seen anything that would indicate any state or federal laws have been broken," but has never closed the review.

**Local Government Defendant**

41. Defendant David Cameron is the City Manager of Springfield, Missouri. On July 29, 2025, he issued an official statement on the City of Springfield’s .gov website condemning RTTL and threatening that “we will not stand idly by.” His statement admitted that “no one from this group has contacted the City directly” and that he was acting on “media reports.” The statement was issued under color of law and constituted an official threat of government action against the Plaintiffs based on unverified media reports about their protected associational activities. The Plaintiffs are suing City Manager Cameron in his official capacity for declaratory and injunctive relief under § 1983.

## IV. FACTUAL BACKGROUND

### The RTTL Community and Its Constitutionally Protected Activities

42. Return to the Land ("RTTL") is a nationwide unincorporated private membership association with over 1,000 members. It is not a legal entity. Its primary activity is hosting social events and meetups. It does not sell, rent, lease, or broker real property and does not engage in real estate transactions of any kind. RTTL does not own or control any corporations, limited liability companies, or other business entities. To the knowledge of RTTL, approximately three percent of RTTL's membership is involved in the collective ownership of land through entities that are separate from RTTL.

43. Wisdom Woods, LLC is an Arkansas limited liability company originally established by members of RTTL for the purposes of owning land and other assets in Arkansas, sharing the expenses related to such assets, and founding an intentional community of families. Wisdom Woods, LLC currently owns approximately 158 acres near Ravenden, Sharp County, Arkansas, and has approximately thirty-one (31) members. Wisdom Woods, LLC is not a subsidiary or affiliate of RTTL. It does not advertise, does not solicit members from the general public, and does not maintain any public-facing online presence.

43(a). RTTL's members have met in person at least semi-annually in Ravenden, Arkansas, including in April 2024, October 2024, April 2025, and October 2025, and at other gatherings around the country. The Ravenden gatherings included speeches by conservative influencers and political activists, leaders of other European Heritage associations, and classes and demonstrations on homesteading and rural life. Each individual Plaintiff attended. The gatherings are the association's principal activity and an exercise of the rights of assembly, speech, and expressive association.

44. RTTL and Wisdom Woods, LLC are operated with bona fide separation. They have separate governing boards, separate founding documents, separate membership, separate

admission criteria, separate financial operations, and separate public presence. Membership in RTTL does not confer membership in Wisdom Woods, LLC, and membership in Wisdom Woods, LLC does not confer membership in RTTL. A person accepted into RTTL is not automatically accepted into Wisdom Woods, LLC.

45. The Plaintiffs' associational activities are protected by the First Amendment. The U.S. Supreme Court has recognized that freedom of association—the right to form and maintain private groups organized around shared values, beliefs, and cultural heritage—is a fundamental constitutional right.

46. The Plaintiffs' speech activities are also protected. RTTL and its members engage in public advocacy through multiple platforms: a Substack newsletter, an X (formerly Twitter) account, YouTube videos depicting homesteading and rural life, a Telegram channel, and a public website (returntotheland.org). These speech activities address matters of public concern—cultural heritage, land use, intentional communities, immigration, private association rights, and constitutional law.

47. In 2025, the Arkansas Fair Housing Commission investigated RTTL in response to media inquiries. The Commission found no evidence of wrongdoing and took no action against RTTL or any associated entity. This prior investigation—by the state agency with direct jurisdiction over fair housing matters in Arkansas—and its exculpatory outcome is significant: the first government agency to examine RTTL's activities concluded there was no violation of law.

**The Media Trigger: The Sky News Documentary**

48. In approximately March 2025, Tom Cheshire, a reporter for Sky News, contacted Plaintiff Orwoll and requested permission to visit the property owned by Wisdom Woods, LLC to produce a news report. Messrs. Orwoll, Csere, and Hallowood invited Cheshire and his crew to visit, believing in good faith that Sky News intended to produce a fair and balanced report about their homesteading community.

49. Cheshire and two other Sky News employees spent several days on the property owned by Wisdom Woods, LLC in or about May 2025. They conducted interviews with Messrs. Orwoll, Csere, Hallowood, and other residents and filmed the property and residents' daily activities.

50. On July 21, 2025, Sky News published a documentary on YouTube titled, "Inside the U.S. community building a 'fortress for the white race' | 'Return to the Land'" (the "Documentary"). The Documentary contained multiple false statements of fact and fabricated evidence, including: (a) A digitally created photograph depicting a tree on the Wisdom Woods property bearing a red spray-painted RTTL logo and the words "WHITES ONLY." This image was created in post-production. No such tree, signage, or markings exist or have ever existed on the property. The image is a fabrication. (b) Misattribution of an X post from the "@RTTL_Official" account stating, "We started a whites-only community"—a tongue-in-cheek response to prior media defamation presented as if it were a literal policy declaration referring to the Wisdom Woods property. (c) Misleading editing and characterization of Orwoll's response to Cheshire's question about whether the community was "whites only"—Orwoll did not answer affirmatively, but the video was edited to create the false impression that he did.

51. In a written companion article, Cheshire disclosed that he personally reported Plaintiffs to the Arkansas Attorney General and solicited a statement, confirming that the reporter personally initiated contact with the state's chief law enforcement officer for the purpose of triggering a government investigation against the Plaintiffs. The Documentary's closing segment states that the Arkansas Attorney General announced his office was "reviewing the matter."

52. As of the date of this filing, the Documentary has accumulated approximately 1.9 million views on YouTube. It triggered extensive additional media coverage, including articles in Newsweek, CNN, The New York Times, the Arkansas Times, and numerous other outlets.

53. On July 24, 2026, Plaintiffs Orwoll, Csere, and Hallowood filed a separate defamation action in this Court against Sky UK Limited, Comcast Corporation, and Tom Cheshire arising

from the Documentary. That separate action, *Orwoll et al. v. Sky UK Limited et al.*, Case No. 3:26-cv-00216-LPR (E.D. Ark.), seeks damages for defamation, false light, tortious interference, and civil conspiracy. This action concerns the government's response to that media coverage. Together, the two actions seek to hold accountable both the private actors who manufactured evidence to trigger government investigations and the government actors who used those investigations to punish constitutionally protected conduct.

**David Cameron's Official Threat (July 29, 2025)**

54. On July 29, 2025—eight days after the Sky News Documentary was published—Springfield City Manager David Cameron published an official statement on the City of Springfield's government website (springfieldmo.gov) under the joint signature of the Springfield City Council and the City Manager.

55. The statement declared that Cameron had been "made aware of media reports regarding a group calling itself 'Return to the Land' and its alleged proposal to create a 'whites-only' enclave in the Springfield area." Critically, the statement admitted: "*While no one from this group has contacted the City directly*, we want to state in the strongest possible terms: there is no place in Springfield, or anywhere, for such a divisive and discriminatory vision." (Emphasis added.)

56. The statement further threatened: "While it is improbable that such a project could legally or practically occur within city limits, silence is not an option. As a regional leader, *we will not stand idly by* in the face of attempts to revive outdated, harmful ideologies." (Emphasis added.)

57. The statement contains multiple admissions establishing its unconstitutional character. Cameron admitted he had no firsthand knowledge—his sole basis was "media reports" triggered by a documentary containing fabricated evidence. RTTL had never contacted Springfield, proposed any development there, or engaged in any activity within Cameron's jurisdiction. The statement singled out RTTL by name, condemned its "vision" as "divisive and discriminatory,"

and declared that “we will not stand idly by”—a threat of official government action. The statement was published on a .gov website under color of law.

**The Arkansas Securities Department Investigation (October 2025—Present)**

58. In October 2025, the Arkansas Securities Department opened an investigation into RTTL, Wisdom Woods, LLC, Allegory Acres LLC, Global Homestead Solutions LLC, and North Arkansas Excavation LLC. The investigation was triggered by a complaint letter from an anonymous activist posing as an “investigative journalist” who, upon information and belief, is a foreign national. Without conducting any independent due diligence or verifying the allegations in the letter, ASD opened an investigation into every entity mentioned in the letter—including Global Homestead Solutions LLC and North Arkansas Excavation LLC, which are service companies that have never offered or sold securities of any kind. On October 21, 2025, Defendant Joslin sent a first information request containing six questions and nine document requests. The request was directed to entities including “RTTL Land Association LLC”—an entity that does not exist and has never existed. The exact name appears only as a placeholder title on an unexecuted draft template that the anonymous complainant provided to the Department. Nothing in the template or the anonymous complaint indicated that "RTTL Land Association LLC" was a registered entity; it had no EIN, no signature, no filing with the Arkansas Secretary of State, and no registration in any jurisdiction. The Department opened a file on it without verifying that it even existed. The investigation concerned whether membership interests in Wisdom Woods LLC and Allegory Acres LLC constitute “investment contracts” under the Arkansas Securities Act.

59. The Plaintiffs responded through counsel on January 5, 2026, providing a detailed legal analysis and producing Bates-numbered documents. The Plaintiffs’ response argued that membership interests are not securities under the Arkansas Securities Act because membership interests confer no right to profit distributions, the entity does not do business with the public or

operate on a for-profit basis, and members purchased their interests for the purpose of sharing expenses as co-owners of land—not with an expectation of profit.

59(a). On January 5, 2026, Plaintiffs' counsel responded and informed the Department in writing that no entity named RTTL Land Association LLC exists.

60. On February 12, 2026—the same day HUD opened its Secretary-initiated investigation—ASD sent a second information request with thirteen additional items. The Plaintiffs responded through counsel.

61. In or about July 2026, Defendant Joslin communicated by telephone with Plaintiffs' counsel, attorney Jonathan McPike of Agathos Law, LLC. During that conversation, Joslin stated that ASD did not plan to take any administrative action and did not plan to request any additional information but intended to change the status of the investigation from that of an open investigation to that of monitoring the situation. Joslin's statement constituted an admission that the ASD investigation—after nearly nine months of cooperation—had not found any violations of the Arkansas Securities Act.

61(a). The Department's treatment of the Plaintiffs departs from its own practice. Across 1,209 published orders from 1998 to 2026, the Department has never proceeded against a single-member limited liability company for issuing unregistered securities in itself, and it has never conducted a land-related securities investigation of an entity that never acquired land or announced a plan to acquire land. In five published no-action matters — Big Cypress Land & Timber Co., LLC (No Action 03-9000308-NA008, May 14, 2003), Walnut Bayou Hunting Club, Inc. (No Action 06-90000343-NA01, Feb. 21, 2006), Blind Hog Hunting Club (No Action 00-14, Dec. 11, 2000), Top Paradise Hunting Club, LLC (No Action 06-90000344-NA002, Feb. 8, 2006), and HSV Dreamhomes, LLC (No Action 04-90000326-NA009, Dec. 7, 2004) — the staff concluded that membership interests sold to fund a land purchase were not securities. Each of those entities proposed to acquire land with member contributions and to fund the purchase by selling

memberships. Wisdom Woods does none of that: it does not advertise, does not solicit, and has no public-facing presence. Membership interests acquired for personal use and shared ownership, rather than for investment, are not investment contracts. See *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 851–53 (1975).

62. Despite this admission, Joslin refused to close the investigation. The Plaintiffs' counsel requested written confirmation of ASD's position, and Defendant Joslin responded by e-mail, saying only the investigation remained open and refused to provide any further detail in writing.

63. The effect of this indefinite open investigation is severe. The Plaintiffs remain under document preservation obligations. The Plaintiffs cannot represent to banks, insurers, business partners, or prospective members that the investigation has been resolved. An investigation that the agency itself admits reveals no violation, yet refuses to close, serves no legitimate law enforcement purpose. It serves only to punish.

**The HUD Secretary-Initiated Investigation (February 2026–Present)**

64. On February 12, 2026, HUD initiated a Secretary-Initiated Investigation into RTTL under 42 U.S.C. § 3610(a)(1)(A)(iii), HUD Inquiry 869910, signed by Defendant Doles. A Secretary-initiated investigation requires no underlying complaint, no identified victim, and no allegation of specific harm to any individual.

65. HUD's evidence included: (a) a "Purchase a Lot" hyperlink on RTTL's website that directed visitors to a general membership application—placed by a web developer who misunderstood the organization and removed over a year before the HUD investigation was opened; (b) membership criteria referencing "common continental ancestry" and "European heritage"—associational criteria protected by the First Amendment; and (c) a tabloid news article (footnote 15 of HUD's initiation letter) sourced from an anonymous activist blogger, which Defendant Doles relied upon to make unsubstantiated allegations of fraud.

65(a). HUD opened its investigation on February 12, 2026 by letter addressed to Eric Orwoll and Wisdom Woods LLC. On July 2, 2026, HUD sent a proposed conciliation agreement listing as respondents RTTL, Wisdom Woods LLC, Eric Orwoll, Peter Csere, Gavin Baker, Alan Mock, and Scott Thomas Hallowood. On August 4, 2026, HUD terminated conciliation and converted the matter to a complaint. On August 24, 2026, HUD filed a complaint under Case No. 00-26-5125-8 naming five respondents: RTTL, Orwoll, Wisdom Woods LLC, Hallowood, and Csere.

65(b). Neither Mr. Csere nor Mr. Hallowood received a written notice explaining the basis for joining them as respondents, as 42 U.S.C. § 3610(a)(2)(B) requires. Neither received an investigation initiation letter or a request for information before being named as a respondent in the July 2, 2026 conciliation agreement.

65(c). HUD's August 24, 2026 complaint asserts that the February 12, 2026 letter "notified Return to the Land, ... Wisdom Woods, L.L.C., Eric Orwoll, Peter Csere, and Scott Thomas Hallowood ... that ... FHEO opened a Secretary-initiated investigation." The February 12 letter is addressed to, and was sent to, "Mr. Eric Orwoll, Wisdom Woods LLC," and to no one else.

66. On February 20, 2026, HUD sent a Request for Information with thirteen items. The Plaintiffs cooperated fully, producing responsive documents and engaging in good faith.

67. RTTL’s position has always been that the Fair Housing Act does not reach its activities because RTTL does not sell, rent, broker, or facilitate real estate transactions. The Arkansas Fair Housing Commission investigated RTTL in 2025 and found no wrongdoing. This distinction between a private membership association and a real estate transaction is not a legal technicality—it is the foundation of the constitutional right of association.

**The EPIC Letter**

68. On the same day HUD mailed its accusatory Secretary-initiated investigation letter to Plaintiffs—February 12, 2026—HUD also mailed a standard Fair Housing Act complaint

notification letter to EPIC Real Properties, Inc., a real estate company in Plano, Texas, regarding Inquiry No. 867711 (the "EPIC Letter"). EPIC allegedly published advertisements that appeared to offer for sale real estate for a "Muslim only" community.

69. HUD placed the EPIC Letter in the wrong envelope and mailed it to the Plaintiffs' address at Wisdom Woods, LLC in Ravenden, Arkansas—rather than to its intended recipient, Imran Chaudhary at EPIC Real Properties in Plano, Texas, which is trying to establish a real estate development for Muslims. HUD's own clerical error thus delivered into the Plaintiffs' hands direct evidence of the agency's disparate treatment. The EPIC Letter provides a contemporaneous, same-agency, same-office, same-investigator benchmark against which the disparate treatment of Plaintiffs can be measured with unusual precision—a benchmark Plaintiffs would never have known existed but for HUD's mistake.

70. The contrast between the two letters, sent by the same agency on the same day and listing the same HUD investigator (Hugh James McGlincy) as the point of contact, is stark and clear evidence of discriminatory animus.

71. The EPIC Letter concerned a formal complaint filed by the Texas Workforce Commission—an actual complainant alleging actual discrimination, assigned an actual case number (Fair Housing Act Case No. 00-26-5019-8). The Plaintiffs' investigation had no complainant, no identified victim, and no case number. It was Secretary-initiated under 42 U.S.C. § 3610(a)(1)(A)(iii), a mechanism that bypasses the normal complaint process and requires no underlying victim.

72. The EPIC Letter explicitly assured the recipient: "We have made no determination as to whether the complaint against you has merit." The Plaintiffs' letter contained no such assurance. To the contrary, it opened by accusing the Plaintiffs of operating "under the guise of a 'private membership association'"—framing the Plaintiffs' organizational form as pretextual before any

investigation had begun. It placed the word "association" in scare quotes to delegitimize the Plaintiffs' chosen form of organization.

73. The EPIC Letter devoted substantial space to informing the recipient of his rights: the right to file an answer within 10 calendar days, the right to amend that answer, the right to request conciliation at any time, the right to have the case heard by an Administrative Law Judge or in federal district court, and the right to file an individual lawsuit even if the Department dismissed the complaint. The Plaintiffs' letter informed them of no rights whatsoever. It offered no conciliation, no process for response, and no timeline for completion of the investigation.

74. The EPIC Letter emphasized standardization and legal even-handedness: "this notification letter contains language required by the law. A similar letter is used to notify all parties whenever a formal complaint has been filed with the Department." The letter explained that HUD's "responsibility under the law is to undertake an impartial investigation" and that if "the investigation indicates that there is no evidence establishing jurisdiction, the case will be dismissed." The Plaintiffs' letter contained none of these assurances of impartiality, standardization, or the possibility of dismissal. It was adversarial and punitive in both language and structure. It suggested Plaintiffs were "possibly fraudulently" selling "communities"—a baseless accusation sourced to a tabloid-style article that cited an activist blogger as its primary source.

75. The EPIC Letter was grounded in an actual complaint filed by a state agency—an objective factual predicate for investigation. The Plaintiffs' letter was grounded in archived website content that had been corrected over seven months earlier, media coverage triggered by a documentary later revealed to contain fabricated evidence, and a tabloid article with no verifiable sources. HUD's investigation of the Plaintiffs rested on media narratives rather than facts, victims, or complaints.

76. Both letters listed Hugh James McGlincy as the HUD contact. On the same day, the same federal investigator was simultaneously responsible for: (i) a standard, procedural, rights-respecting investigation of a Texas real estate company facing an actual complaint; and (ii) an accusatory, rights-ignoring, Secretary-initiated investigation of an Arkansas homesteading community with no complainant. The same official, in the same office, on the same day, treated similarly situated FHA respondents in radically different ways. The only distinguishing characteristic was the identity of the target: a conventional real estate company that openly planned to build a real estate development for Muslims, announced a public offering for real-estate sales, and reportedly raised $40 million, versus a private membership association portrayed in media as "whites-only," with no public offering and no real-estate sales.

77. The Plaintiffs possess the EPIC Letter only because HUD itself placed it in the wrong envelope and mailed it to the Plaintiffs' address. HUD's clerical error—putting the letter for a Texas real estate company into an envelope addressed to an Arkansas homesteading community—is what revealed the disparate treatment. That the Plaintiffs' knowledge of HUD's discriminatory conduct depends on HUD's own incompetence underscores the secrecy with which the agency conducted its extraordinary treatment of the Plaintiffs. Had HUD not made this mistake, the Plaintiffs would never have known that the same investigator, on the same day, treated a similarly situated respondent with procedural regularity and respect while subjecting the Plaintiffs to an accusatory, rights-ignoring investigation.

78. The EPIC Letter is direct evidence of disparate treatment. It establishes that HUD knew how to conduct a procedurally regular, rights-respecting, impartial FHA investigation—and chose not to do so when the target was the Plaintiffs. The contrast supports the inference that the Plaintiffs were singled out for extraordinary treatment not because of any evidence of unlawful conduct, but because of their identity, their viewpoint, and the media narrative surrounding them. This inference is further strengthened by the fact that, as alleged herein, the Arkansas Fair Housing Commission

had already investigated and cleared RTTL in 2025, and the Arkansas Attorney General had publicly stated he had “not seen anything that would indicate any state or federal laws have been broken.”

79. On April 28, 2026, while the HUD investigation was active, Defendant Trainor published, “Let’s Make Civil Rights Enforcement Constitutional Again,” in City Journal.

80. Trainor condemned “a racial spoils system that doles out rewards to favored constituencies.” He chastised HUD for acting like a “social-justice NGO” instead of a federal law enforcement agency. He quoted his predecessor, Justice Clarence Thomas, who said that civil rights enforcement gets "hijacked by the bureaucracy" in response to "special-interest groups."

81. His statements openly acknowledged that HUD and its activist attorneys have established a historic pattern and practice of improperly and unlawfully weaponizing the agency to target disfavored groups “in a manner that infringes on free speech” based on racial animus.

82. Two months later, on July 2, 2026, Trainor purported to act as the named “Complainant” on HUD’s draft of the conciliation agreement, which violated every principle he had publicly articulated.

**The HUD Conciliation Demands (July 2, 2026)**

83. On July 2, 2026, HUD transmitted a proposed Title VIII Conciliation Agreement to the Plaintiffs’ counsel, intended to be signed by Defendant Meltesen with Defendant Trainor as “Complainant.” The agreement named as Respondents Return to the Land, Wisdom Woods LLC, Eric Orwoll, Peter Csere, Gavin Baker, Alan Mock, and Scott Thomas Hallowood. Global Homestead Solutions LLC and North Arkansas Excavation LLC—though subject to HUD’s document preservation demand in the February 20, 2026 request for information cover letter—were not named as Respondents in the conciliation agreement.

84. The agreement demanded unconstitutional terms:

- $40,000 Compensation Fund (§ VI.G.27): A fund to be advertised by the Respondents at their own expense, distributed by HUD with no independent oversight, no judicial review, no standard of proof, and no underlying complaint from any individual claiming discrimination. The fund precisely matches Trainor's description of a "racial spoils system that doles out rewards to favored constituencies."
- $10,000 Civil Penalty (§ VI.H.31).
- Three-Year Monitoring with mandatory reporting.
- Compelled Speech (§ VI.E.23): Government-mandated equal housing opportunity statements on all of the Plaintiffs' inherently expressive social media platforms, including YouTube, Substack, X, and Telegram—compelling the Plaintiffs to speak the government's message.
- Restrictions on Associational Language (§ VI.E.24): Restrictions on the Plaintiffs' use of the word "community."
- Addition of Parties Without Prior Notice: The original HUD investigation letter was addressed only to Wisdom Woods, LLC and Eric Orwoll. Without any prior notice, HUD subsequently expanded its investigation and conciliation agreement to include as additional Respondents: Peter Julius Csere, Scott Thomas Hallowood, Gavin Baker, Alan Mock, and Return to the Land. None of these parties received an investigation initiation letter or any other form of notice before being named as Respondents subject to obligations including payment into a $40,000 Compensation Fund, submission to government monitoring, and alteration of their speech and association.

85. The agreement’s compelled speech provisions directly contradict Trainor’s public statement that the Act “must not be enforced in a manner that infringes on the free speech.” Its compensation fund contradicts Trainor’s condemnation of “racial spoils systems.” Its addition of individuals without notice contradicts Trainor’s commitment to due process.

**HUD's Bad-Faith Termination of Conciliation (August 4, 2026)**

86. On July 30, 2026 at 11:10 AM, Defendant McGlincy emailed the Plaintiffs' counsel: "I have been told that if we do not hear from you regarding conciliation this week we will consider conciliation closed, so I hope to hear from you because I do think, as we discussed, there is a possibility of successful resolution."

86(a). On September 8, 2026, Plaintiffs served an attorneys' response to the complaint and a written request that HUD hold the proceeding in abeyance pending resolution of this action. HUD has not responded to either.

87. Later that same day, at 5:04 PM, the Plaintiffs' counsel responded: "We'd like to find a time to discuss some high-level issues with you before we start negotiating the finer points. Please let me know when works for you." This was a good-faith request for a telephone conversation—not a rejection of conciliation, not a refusal to discuss settlement terms.

88. On August 4, 2026, at 3:03 PM, Defendant McGlincy responded: "Given the objections you raised and your belief that it would be premature to discuss the Department's settlement terms, please be informed that the Department will be converting the Secretary-Initiated Inquiry into a Secretary-Initiated Complaint."

89. Defendant McGlincy was referring to a formal letter sent by counsel to the Plaintiffs in his email of August 3, 2026, in which he raised the same concerns described in this Complaint and noted that Defendant McGlincy sent his draft of the conciliation agreement to counsel to the Plaintiffs without ever having reviewed the second of two document productions that the Plaintiffs produced to HUD. Counsel to the Plaintiffs only learned about this because Defendant McGlincy e-mailed him on July 16, 2026—two full weeks before providing a draft of the conciliation agreement—telling him that HUD had lost the second document production that counsel to the Plaintiffs had overnighted in hardcopy. Counsel to the Plaintiffs told Defendant McGlincy that the Plaintiffs believed that it would be premature to discuss the terms of the conciliation agreement in

detail "until such time as the Department has confirmed to the Respondents in writing that the Department has in fact reviewed all of the documents produced by the Respondents in each of the Respondents' productions."

90. The sequence demonstrates that HUD—not the Plaintiffs—ended the negotiation. HUD proposed terms that required the Plaintiffs to pay $40,000, accept a civil penalty, submit to monitoring, and restrict their speech, while offering to give up nothing — not even the investigation itself. It then pressed for a response. When the Plaintiffs asked to discuss those terms, HUD refused the call, mischaracterized their position, and converted the matter to a complaint.

90(a). HUD's regulations permit it to terminate conciliation efforts on three grounds only: that the respondent "fails or refuses to confer with HUD"; that the aggrieved person or the respondent fails to make a good faith effort to resolve the dispute; or that HUD finds "for any reason" that voluntary agreement is not likely to result. 24 C.F.R. § 103.325(a). None of the three existed. The Plaintiffs did not refuse to confer — they asked to confer, by telephone, on the day HUD closed the track. Nor did they fail to make a good faith effort; they had produced documents, responded in writing, and asked to discuss the terms. And the only reason voluntary agreement was not likely to result was that HUD's own proposal offered the Plaintiffs nothing: it did not offer to close the investigation, and it demanded $40,000, a $10,000 civil penalty, three years of government monitoring, and restrictions on the Plaintiffs' speech. A futility that the agency creates cannot be the ground on which the agency terminates conciliation. The purported termination was therefore not authorized, and the conciliation period described in 42 U.S.C. § 3610(b)(1) continued.

91. The Plaintiffs sought conciliation. HUD refused to discuss the terms it had proposed. HUD has escalated to a formal complaint without articulating any clear legal theory against the Plaintiffs and without identifying a single bona fide real estate offer, sale, or transaction that would be subject to the Fair Housing Act.

**The DOJ Civil Rights Division Investigation (June 2026—Present)**

92. On June 4, 2026, the Civil Rights Division of the DOJ opened an investigation under the Fair Housing Act, DJ# 175-9-147, signed by Defendant Dhillon and countersigned by Defendant Pagnucco, with Defendants Smith and Ross copied. The letter explicitly cited the Attorney General's authority to file federal litigation under 42 U.S.C. § 3614(a).

93. An attachment to the letter contained eight document requests, including demands that Plaintiffs explain their "European heritage" and "common continental ancestry" criteria (Request 6) and state their legal position on FHA applicability (Request 8) — demands that Plaintiffs justify their protected associational choices.

94. The Plaintiffs filed a comprehensive executed response on July 13, 2026, through counsel, addressing all eight requests and producing Bates-numbered documents. The Plaintiffs' counsel also transmitted a letter dated July 7, 2026 requesting a meeting with the leadership of the Civil Rights Division.

95. As of the date of this filing, the leadership of the Civil Rights Division has not responded to the Plaintiffs' submission, has not responded to multiple meeting requests, and has not communicated with the Plaintiffs in any manner. Neither the Civil Rights Division in Washington nor Defendant Ross's office in Little Rock has responded. The DOJ investigation remains open. The Civil Rights Division's silence—like ASD's refusal to close—leaves the Plaintiffs in perpetual legal uncertainty, prevents judicial review, and chills protected activity.

**DOJ Closed an Investigation into EPIC Based on Criteria Plaintiffs Also Satisfy**

96. The clearest comparator for DOJ's conduct is DOJ's own prior investigation of EPIC.

97. On April 11, 2025, U.S. Senator John Cornyn wrote to Assistant Attorney General Dhillon requesting that the Civil Rights Division investigate whether EPIC City's marketing to a single religious community violated the Fair Housing Act. DOJ opened an investigation.

98. On June 13, 2025, Assistant Attorney General Dhillon, over her own signature and countersigned by Defendant Pagnucco, the same two officials who signed the June 4, 2026 letter opening DOJ's investigation of Plaintiffs, closed the EPIC investigation. See https://npr.brightspotcdn.com/06/f5/520b8fd84c9181e2f1e864d8fddd/2025-06-13-letter-from-doj-to-epic.pdf.

99. The closure letter identified three grounds for closing the investigation: (1) the underlying property, though purchased, remained "in the planning stage" and the developer had "not yet sought any permits to develop the property"; (2) the developer expected to begin permitting only in the following months, with full development taking "several years"; and (3) the developer affirmed that "all will be welcome" in any future development and committed to revise its marketing materials to reflect its obligations under the Fair Housing Act. On the strength of those representations alone, Dhillon closed the investigation and thanked the target for its cooperation.

100. By the standard Dhillon herself applied and signed less than a year earlier, Plaintiffs' investigation should already be closed. Unlike EPIC, which had (upon information and belief) purchased land, taken in roughly $40 million from approximately 500 lot sales, and openly marketed the development to a single faith community, Wisdom Woods has never sold or advertised a single lot to the public, has sought no permits, has no timeline for seeking any, and has taken affirmative steps to ensure that nothing in its public communications could be construed as implicating the Fair Housing Act. Plaintiffs satisfy every closure criterion Dhillon articulated for EPIC, yet DOJ closed its investigation of an active $40 million commercial development within two months of opening it, while its investigation of Plaintiffs — who have transacted in no real estate at all — remains open. Dhillon's personal, signed application of a closure standard to one project, followed within a year by her personal decision to open and sustain an investigation against a group that meets that same standard, is direct evidence of disparate treatment.

### Other Identity-Based Community Initiatives Not Investigated

101. The EPIC investigation is not the only available comparator. Publicly available information, offered here on information and belief and subject to further development in discovery, identifies other organizations that publicly organize community or housing-related initiatives around a shared racial, ethnic, or other identity characteristic, without having faced any Secretary-initiated or Division-initiated federal investigation comparable to the one directed at Plaintiffs.

102. Habitat for Humanity International publicly advertises initiatives specifically directed at advancing Black homeownership, describing race-conscious programming on its own website. See Habitat for Humanity, Advancing Black Homeownership, https://www.habitat.org/our-work/advancing-black-homeownership. Upon information and belief, this initiative has not been the subject of any HUD Secretary-initiated investigation or DOJ Civil Rights Division investigation of the kind directed at Plaintiffs.

103. A group called "Black to the Land" publicly describes itself as facilitating "planned, cooperative living spaces where African Americans gather to build safety, generational wealth, culture, and food sovereignty on their own terms." See https://www.blacktotheland.com. Upon information and belief, Black to the Land has not been the subject of any comparable federal investigation, notwithstanding that it claims to organize intentional community around shared racial identity in a manner not meaningfully distinguishable, for purposes of the Fair Housing Act, from RTTL's own public statements about its own community.

104. A senior housing residence for individuals identifying as LGBTQ in Washington, D.C. received public grant support in connection with its opening, rather than facing federal investigatory scrutiny for organizing around a shared and legally protected identity characteristic. See Interview, NPR, LGBTQ home for seniors in D.C. (Apr. 15, 2025), https://www.npr.org/2025/04/15/nx-s1-5261718/lgbtq-home-seniors-dc.

105. Plaintiffs are aware of no principled, viewpoint-neutral basis for treating these organizations' public, identity-based community and housing initiatives differently from RTTL's own public statements about organizing community around shared heritage—other than the racial and viewpoint content of what each organization has said publicly.

**Harm to Plaintiffs**

106. The government actions have caused and continue to cause severe and ongoing harm:

107. **First Amendment chill.** The Plaintiffs are deterred from posting on social media, publishing articles, or speaking publicly. Prospective and existing members are hesitant to associate openly.

108. **Legal fees.** The Plaintiffs have incurred substantial legal fees responding to the HUD, DOJ, and ASD investigations.

109. **Reputational harm.** Open federal and state investigations stigmatize Plaintiffs in their community, business relationships, banking, and insurance.

110. **Emotional distress.** Simultaneous multi-front government actions cause severe anxiety, stress, and fear, compounded by perpetual uncertainty.

111. **Property value diminution.** The stigma of multiple open investigations has diminished the value of Wisdom Woods LLC's real property.

112. **Deterrence of prospective members.** The stigma of multiple open investigations has caused a decline in membership applications to RTTL.

113. **Loss of privacy.** The Plaintiffs' personal information has been exposed through government investigations and associated media coverage.

114. **The harm is irreparable.** The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## V. THE CONSPIRACY — COMMON ALLEGATIONS

115. The government actions described above share a common origin, follow a common pattern, target common victims, and produce a common effect. The Defendants have engaged in a concerted campaign to punish the Plaintiffs for their protected speech and association.

### Common Origin—Media-Driven Viewpoint Animus

116. Every action traces to the Sky News Documentary or its ensuing media coverage. Cameron explicitly cited "media reports" and admitted no direct contact. HUD relied on media coverage and an anonymous blogger. The DOJ cited RTTL's public website as described in media coverage, not as it actually was. ASD opened its investigation in the same timeframe as the media firestorm. None of these investigations was triggered by a complaint from an individual claiming discrimination.

### Common Pattern—Investigation Without Complaint

117. HUD used the Secretary-initiated mechanism (§ 3610(a)(1)(A)(iii)), requiring no complaint. The DOJ opened its investigation without identifying any victim. ASD opened its investigation without a complaint from an actual, legitimate investor. Legitimate civil rights enforcement begins with a victim. These investigations began with a media narrative.

### Common Pattern—Escalation Rather Than Resolution

118. All three of the Defendant agencies in question followed a similar pattern in taking action against the Plaintiffs: HUD opened an investigation, proposed an unconstitutional conciliation, refused to discuss concerns, terminated conciliation, and then escalated to a formal complaint. ASD opened an investigation, received full responses, did not find any violation, and still refused to close the investigation. The DOJ opened an investigation with the threat of litigation, received a full response, and went silent. None of the investigations has reached a

legitimate conclusion. None has resulted in a finding of violation after full consideration of the Plaintiffs' evidence.

**Common Pattern—Compelled Speech and Associational Restrictions**

119. Multiple Defendants demanded that the Plaintiffs explain, justify, or alter protected associational choices. HUD's conciliation agreement compelled speech and restricted associational language. The DOJ's Attachment A demanded that the Plaintiffs justify their membership criteria. But the First Amendment protects the right of private associations to define their own membership criteria without government interference.

**Common Pattern—Targeting Individuals Without Notice**

120. The original HUD investigation letter was addressed only to Wisdom Woods LLC and Eric Orwoll, though it immediately named Return to the Land as the primary subject of the investigation, and included multiple unrelated LLCs in its Request for Information despite these entities not being named Respondents and not having been notified that they were subject to investigation. When the Plaintiffs' counsel twice inquired in writing early in the investigation as to who was under investigation, HUD never responded. Only much later, without any notice to the affected parties, did HUD subsequently list Peter Julius Csere, Scott Thomas Hallowood, Return to the Land, and two unrelated individuals, as additional Respondents in its draft conciliation agreement. None of these additional parties received an investigation initiation letter, a request for information, or any other notice that they were under investigation before being named as Respondents in the draft conciliation agreement. Two individuals who do not reside in Arkansas and have no connection to any Arkansas real estate were named as Respondents without ever being notified they were under investigation. Global Homestead Solutions LLC and North Arkansas Excavation LLC—service companies that do not sell, rent, or broker real property—were included in a federal housing discrimination investigation without ever being informed they were under investigation.

120(a). HUD's July 2, 2026 proposed conciliation agreement listed Gavin Baker and Alan Mock as respondents and included signature blocks for both. Neither appears in HUD's August 24, 2026 complaint. Each was added and removed without any written joinder notice in either direction.

**Common Pattern — Perpetual Open-Endedness as a Weapon**

121. ASD refuses to close despite admitting no violation. DOJ refuses to respond despite receiving full compliance. Defendant Griffin has maintained an open-ended "review" of RTTL since July 2025—making public statements that stigmatize the Plaintiffs while never informing them of any investigation, never contacting them, and never closing the matter. An investigation that never closes can never be challenged on its merits. An investigation that produces no final agency action is difficult to challenge in court. The perpetual open investigation is a more effective tool of intimidation than an investigation that reaches a conclusion.

**Evidence of Disparate Treatment**

122. Trainor's City Journal article provides direct evidence of disparate treatment. He publicly stated what legitimate enforcement looks like. His enforcement against the Plaintiffs is the opposite.

123. The EPIC Letter—mailed by HUD on the same day as the Plaintiffs' investigation letter, by the same investigator, from the same office—provides uniquely powerful evidence of disparate treatment because it eliminates the ordinary variables that make comparisons across government enforcement actions difficult. The two letters share the same date (February 12, 2026), the same agency (HUD FHEO), the same contact official (Hugh James McGlincy), the same statutory framework (the Fair Housing Act), and the same ostensible purpose (notifying a target of a housing discrimination investigation). They differ in only one material respect: the identity of the target. The Plaintiffs possess this evidence only because HUD placed the EPIC Letter in the

wrong envelope—addressed to Wisdom Woods, LLC in Ravenden, Arkansas rather than to EPIC Real Properties in Plano, Texas. HUD's own clerical error exposed its own disparate treatment.

124. The EPIC Letter demonstrates that HUD possessed and routinely deployed a standardized, procedurally regular template for FHA investigation notifications—one that presumes innocence, informs recipients of their rights, offers conciliation, and explains the investigative process. HUD deliberately departed from that template when it wrote to the Plaintiffs. The departure was not accidental. The RTTL letter was not a different form letter; it was a bespoke accusatory document that deployed scare quotes to delegitimize the Plaintiffs' associational form ("association"); accused Plaintiffs of operating "under the guise" of lawful organization; suggested fraudulent conduct based on a tabloid article rather than investigative findings; threatened DOJ referral; demanded expansive document preservation; and disclosed no rights, no process, and no possibility of dismissal.

125. This deliberate departure from HUD's own standardized procedures is evidence of disparate treatment. When an agency abandons its normal, even-handed procedures to target a particular respondent with extraordinary measures, the natural inference is that the agency is motivated by something other than routine law enforcement—in this case, by the viewpoint and identity of the target.

126. The EPIC Letter also corroborates the pattern alleged throughout this Section: the Plaintiffs were not treated as ordinary subjects of a regulatory investigation. They were treated as enemies of the state to be delegitimized, stigmatized, and punished through the investigative process itself. The contrast between the two letters—one procedural and bureaucratic, the other accusatory and punitive—mirrors the broader contrast between how the government treats conventional real estate companies accused of discrimination (with complaints, case numbers, process, and rights) and how it treated the Plaintiffs (with no complaint, no case number, no process, and no rights). That this evidence reached the Plaintiffs only through HUD's own mailing

error—the agency inadvertently exposing its own discriminatory conduct—is a fact from which a factfinder may draw an adverse inference about the care and legitimacy with which HUD conducted its investigation of the Plaintiffs.

**Coordination**

127. The commonalities are too numerous for coincidence. Common origin (same media trigger). Common targets (RTTL, Wisdom Woods LLC, Orwoll, Csere). Common timing (ASD second request and HUD investigation initiated the same day: February 12,2026). Common legal theory (applying fair housing/securities laws to PMA membership criteria). Common trajectory (no findings of violation after full responses). They are the circumstantial proof of a coordinated campaign that punishes the Plaintiffs for protected conduct through investigation itself.

## VI. EXHAUSTION OF ADMINISTRATIVE REMEDIES

128. The Plaintiffs have pursued all remedies available within the administrative processes. To the extent any remain, they are futile, inapplicable to constitutional claims, and cannot provide the relief Plaintiffs seek.

129. Constitutional claims against state actors under § 1983 are not subject to administrative exhaustion. *Patsy v. Board of Regents*, 457 U.S. 496, 516 (1982). Nor must a § 1983 plaintiff exhaust available state-court remedies before seeking relief in federal court. *Knick v. Township of Scott*, 588 U.S. 180, 185 (2019). The Supreme Court applied that rule last Term, rejecting the argument that a § 1983 plaintiff must first exhaust available state-court remedies. *First Choice Women's Resource Ctrs., Inc. v. Davenport*, 608 U.S. 174, 195–96 (2026).

130. The same principle applies to constitutional claims for equitable relief against federal officers. *McCarthy v. Madigan*, 503 U.S. 140, 144, 146–49 (1992). The HUD ALJ process cannot adjudicate whether HUD's own investigation violates the Constitution. Only this Court can provide the constitutional remedies Plaintiffs seek.

130(a). The Fair Housing Act's review provisions do not channel these claims. First, the Act's scheme is directed at the adjudication of charges, not at the review of an open investigation; there is no provision for review of an investigation that has not produced a charge. Second, the claims here are constitutional claims about the initiation and maintenance of investigations, not challenges to HUD's expertise in housing discrimination, and they are wholly collateral to any eventual charge. Third, and decisively, preclusion would foreclose all meaningful judicial review: a respondent cannot obtain review of an investigation that never ends, and the injury alleged here is the pendency of the investigation itself. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207–18 (1994); *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023).

131. Plaintiffs cooperated fully, produced all requested documents, engaged with the proposed conciliation agreement, identified concerns, requested a discussion, were denied that discussion, and had the process closed by HUD. HUD's regulations did not authorize that step: the Plaintiffs did not refuse to confer, and the futility on which HUD relied was created by HUD's own proposal. 24 C.F.R. § 103.325(a). Plaintiffs cannot be required to exhaust a process HUD refuses to conduct.

132. HUD has demonstrated it will not engage in good-faith resolution. An agency that refuses a telephone call, mischaracterizes that refusal by ignoring the agency’s own culpability in giving counsel legitimate concerns, and terminates conciliation based on the mischaracterization has demonstrated that further engagement would be futile. *McCarthy*, 503 U.S. at 146–49 (exhaustion may be excused where administrative remedy is inadequate, futile, or where agency has predetermined the issue).

133. With respect to ASD, there is no process to exhaust. ASD admits no action is planned yet refuses to close. With respect to DOJ, exhaustion is impossible because DOJ refuses to communicate.

134. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. Requiring Plaintiffs to endure months or years of administrative proceedings while their constitutional rights are violated daily would render judicial relief an empty formality.

135. Count VII is pleaded in two parts. In the alternative, and without waiving either theory, Plaintiffs allege (a) that HUD failed to perform a discrete, legally required act — the § 3610(a)(2) joinder notice — and (b) that HUD's termination of conciliation and conversion to a formal complaint is final agency action that is arbitrary, capricious, and contrary to constitutional right. Plaintiffs do not ask the Court to review the merits of any HUD determination of discrimination.

136. The APA does not apply to ASD. Section 702 waives sovereign immunity only for federal agencies, and ASD is a state agency. Plaintiffs therefore do not plead ASD's refusal to close as "final agency action" or as an APA claim. The refusal to close is a continuing constitutional injury, and because ASD has stated that no administrative action is planned and no further information is needed, there is no administrative process left to exhaust. The State Defendants' amenability to suit is governed by 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908).

136(a). The § 702 waiver is invoked only against the federal Defendants, and only as to the federal action pleaded in Count VII.

137. DOJ's failure to respond for more than four months while keeping the investigation open constitutes agency action unreasonably delayed under 5 U.S.C. § 706(1).

138. Agency action that chills First Amendment rights is reviewable without awaiting further proceedings. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149–54 (1967), overruled in part on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

139. Even setting aside the exhaustion and finality analysis above, Plaintiffs need not await the conclusion of any Defendant's investigation, any enforcement action, or any referral to demonstrate a present, concrete Article III injury sufficient to proceed in this Court now.

140. In *First Choice*, 608 U.S. at 189, 194, the Supreme Court held, unanimously, that a nonprofit organization suffered a present First Amendment injury from a state attorney general's investigatory subpoena demanding donor information, even though the subpoena was "non-self-executing" and no court had yet ordered compliance. The Court explained that an official investigatory demand "inevitably" deters the exercise of associational and expressive rights for as long as it remains outstanding, regardless of whether or when it is ultimately enforced, and that a recipient of such a demand need not wait for enforcement, or for parallel proceedings to conclude, before seeking relief in federal court. *Id.*

141. The same reasoning applies here with at least equal force, and to every Defendant's investigation.

142. HUD's and DOJ's document demands require Plaintiffs to disclose, among other things, RTTL's membership criteria, Land Association information, and the identities and beliefs of individuals associated with Plaintiffs' protected activities—information whose compelled disclosure this Court's and the Supreme Court's precedents have long recognized as a direct burden on associational freedom.

143. ASD's demand for membership and investment information from Wisdom Woods LLC and Allegory Acres LLC carries the same associational burden. None of these demands has been formally enforced through a court order, and HUD's investigation has not proceeded to a final ALJ determination, DOJ has not yet filed suit, and ASD has neither closed its file nor initiated a formal enforcement proceeding — but under *First Choice*, that is precisely the posture in which a chilling injury is most in need of, and most amenable to, present judicial review, because the injury exists as long as the demand remains outstanding, not only once it is enforced.

144. *First Choice* forecloses any argument that Plaintiffs must wait for HUD's Secretary-Initiated Complaint to reach an Administrative Law Judge, for DOJ to decide whether to sue under 42 U.S.C. § 3614(a), or for ASD to either close its file or commence a formal proceeding, before

this Court may adjudicate the constitutional injury that the pendency of these investigations is already inflicting on Plaintiffs.

145. As in *First Choice*, Plaintiffs' inability to guarantee members, prospective members, and donors that their identifying and associational information will not be compelled from Plaintiffs and disclosed to the government has already deterred, and continues to deter, individuals from associating with Plaintiffs, exactly the kind of present, ongoing injury *First Choice* held sufficient to proceed. *First Choice*, 608 U.S. at 189–94.

145(a). The injury is present in both tracks. For Wisdom Woods, the investigation remains open after the examining attorney stated that no administrative action was planned and no further information was needed; the injury is the pendency of the file. For Global Homestead Solutions, North Arkansas Excavation, and Allegory Acres, the investigation had no securities subject, yet it remains open; the injury is the investigation itself. In both postures, the injury continues for as long as the investigation remains outstanding. *First Choice*, 608 U.S. at 189, 194.

## VII. CLAIMS FOR RELIEF

### COUNT I

### First Amendment Retaliation (Against All Individual Defendants in Their Official Capacities)

146. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

146(a). The claims in Count I against the State and local Defendants are brought under 42 U.S.C. § 1983. The claims against the federal Defendants are brought for prospective relief against officers of the United States. The cause of action is the equitable action against federal officers who act in violation of the Constitution. *Armstrong v. Exceptional Child*, 575 U.S. at 327; *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 491–92 n.2 (2010). Sovereign immunity does not bar

that relief because the officers acted outside their lawful authority and in violation of the Constitution. *Larson*, 337 U.S. at 689–91; *Dugan*, 372 U.S. at 620–22; 5 U.S.C. § 702. The equitable action is not displaced here: the Fair Housing Act's review provisions do not supply any pre-enforcement review of an open investigation, and the alternative remedy the Defendants will identify — an administrative hearing years from now — is not adequate to redress an ongoing constitutional injury. Cf. *Armstrong v. Exceptional Child*, 575 U.S. at 327–28. The alternative remedy the HUD Defendants will identify — conciliation — is not adequate either. HUD conducted that process in bad faith: it refused the Plaintiffs' counsel's request for a telephone call to discuss their concerns, ignored their documented objection that HUD had lost a production and had not reviewed the record, and converted the matter to a complaint while the Plaintiffs were fully cooperating and asking to be heard. ¶¶ 86–91. HUD's own regulation did not permit it to close the track on those facts. 24 C.F.R. § 103.325(a). A remedy the agency refuses to afford is not an adequate alternative.

146(b). The constitutional limits on the federal Defendants' authority are pleaded in the Counts that follow. In addition, and in the alternative, the federal Defendants exceeded specific statutory prohibitions. HUD's authority to investigate is conferred by 42 U.S.C. § 3610, and its authority to conciliate is confined by § 3610(b)(1) to "the period beginning with the filing of such complaint and ending with the filing of a charge or a dismissal." HUD's own regulations implement that limit, permitting conciliation only "[d]uring the period beginning with the filing of the complaint." 24 C.F.R. § 103.300(a). On July 2, 2026, HUD transmitted a "Title VIII Conciliation Agreement" naming seven respondents — RTTL, Wisdom Woods, LLC, Mr. Orwoll, Mr. Csere, Mr. Hallowood, Gavin Baker, and Alan Mock — and demanding that they agree to a $40,000 compensation fund, a $10,000 civil penalty, three years of government monitoring, and restrictions on their speech. No complaint had been filed. HUD's own agreement recites that the investigation was opened "to determine whether a complaint should be brought." The conciliation power HUD

exercised therefore did not yet exist, and the persons it named as respondents were never joined by the written notice that § 3610(a)(2)(B) requires. Nonstatutory review of these claims is available because the Fair Housing Act's review provisions afford no pre-enforcement review of an open investigation, and the Defendants therefore cannot show the "adequate opportunity for judicial review" that would foreclose it. *Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958); *Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 681 (2025).

147. The First Amendment prohibits government officials from retaliating against individuals for exercising their rights of speech, association, and petition.

148. The Plaintiffs engaged in constitutionally protected activity: forming and maintaining a private membership association organized around shared values and cultural heritage; publicly advocating for homesteading, intentional communities, and private association rights; and defining membership criteria based on shared cultural heritage.

148(a). **Wisdom Woods.** Even assuming the initial inquiry was supported by a legitimate purpose, Defendant Joslin told Plaintiffs' counsel in July 2026 that no administrative action was planned and no further information was needed. The Department then refused to close the investigation or provide written confirmation. Maintaining an investigation after the agency has concluded that no violation occurred serves no legitimate purpose. It serves only to prolong the burden, the stigma, and the chill.

148(b). **Global Homestead Solutions, North Arkansas Excavation, and Allegory Acres.** Global Homestead Solutions and North Arkansas Excavation are single-member companies with no membership interests to sell. Allegory Acres LLC has eight founding members who acquired their interests at formation (for shared ownership and use rather than for investment), but it never acquired land, never publicly announced a plan to acquire land, and never sold a membership interest. The investigation of the three had no securities subject. Refusing to close it compounded an investigation that should never have begun.

148(c). **Targeting through the entities.** Global Homestead Solutions LLC is owned solely by Peter Csere. North Arkansas Excavation LLC is owned solely by Scott Thomas Hallowood. Neither entity had any securities activity. The only connection between them and the investigation is their owners' membership in RTTL and their public speech. Naming the entities was a means of reaching the individuals.

148(d). Plaintiffs' protected activity includes: the April 18, 2025 Substack post titled "How do I join an RTL neighborhood?"; the @RTTL_Official post quoted in ¶ 50(b); the YouTube videos depicting homesteading and rural life; the extensive media interviews, podcasts, and social media posts featuring Mr. Orwoll, Mr. Csere, and Mr. Hallowood expressing controversial views on political topics; the membership criteria described in ¶ 148; and the RTTL gatherings in Ravenden, Arkansas, in April 2024, October 2024, April 2025, and October 2025, which included speeches by popular conservative influencers and political activists and classes on homesteading and rural life.

149. The adverse action, as to the Defendant agencies, is the investigation itself, maintained after the agency's own conclusion. It is not a single discrete act; it is a continuing state of affairs that imposes document-preservation obligations, legal expense, reputational harm, and the inability to obtain closure. An investigation that the agency has conceded requires no further action, yet refuses to close, would chill a person of ordinary firmness from continuing to speak, associate, and advocate. The injury continues "for as long as [the demand] remains outstanding." *First Choice*, 608 U.S. at 189.

149(a). As to Defendants Cameron and Griffin, the adverse action is different in kind and is pleaded separately. Defendant Cameron, acting under color of law on an official City of Springfield website, publicly condemned the Plaintiffs by name as a "divisive and discriminatory vision," admitted that "no one from this group has contacted the City directly," and declared that "we will not stand idly by." ¶¶ 54–57. Defendant Griffin, the State's chief law enforcement officer,

announced that his office was "reviewing" or "looking into" RTTL, publicly condemned the Plaintiffs' protected expression, and has maintained that open-ended review without notice, findings, or closure for more than a year. ¶¶ 40, 40(a), 121. In each case the adverse action is the combination of an official public condemnation with an outstanding threat or review directed at the Plaintiffs' protected activity — not the statement alone. A public statement standing by itself would not be an adverse action; a statement that announces and sustains government scrutiny of identified speakers is.

150. There is a causal connection between the Plaintiffs' protected activity and the adverse actions.

151. The Defendants lacked any legitimate, non-retaliatory basis.

152. The absence of any legitimate purpose, combined with the affirmative evidence of disparate treatment alleged in ¶¶ 122–126 and 148(a)–(d), establishes that the Defendants were motivated by viewpoint animus — by the content of the Plaintiffs' speech and association, and by the media narrative that content produced. The investigations target what the Plaintiffs said and whom they associate with, not anything the Plaintiffs did.

**COUNT II**

**Conspiracy to Violate Civil Rights**

**42 U.S.C. § 1985(3)**

**(Against All Individual Defendants in Their Official Capacities)**

153. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

153(a). **Immunity and vehicle.** The claims in this Count against the State and local Defendants are brought under 42 U.S.C. §§ 1983 and 1985(3). The claims against the federal Defendants are brought for prospective relief only, under the equitable action and the immunity

principles pleaded in ¶ 146(a). Section 1985(3) supplies the substantive right; it does not itself waive the United States' sovereign immunity, and the Plaintiffs do not contend otherwise.

154. 42 U.S.C. § 1985(3) creates a cause of action against persons who "conspire . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." 42 U.S.C. § 1983 creates a cause of action against persons acting under color of State law. The claims in this Count against the State and local Defendants are brought under both statutes; the claims against the federal Defendants are brought under § 1985(3) for prospective relief only, as pleaded in ¶ 153(a).

155. The Defendants reached an agreement or meeting of the minds—whether explicit or tacit—to target the Plaintiffs with coordinated investigations designed to punish protected speech and association. The existence of an agreement is supported by the same media trigger; the same-day timing of the ASD second request and HUD's investigation on February 12, 2026; the common targets; the common legal theory; and the common pattern of investigation-without-complaint and escalation-without-resolution. These are specific facts tending to show a meeting of the minds, not merely parallel conduct. *Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010) (requiring specific facts tending to show a meeting of the minds in a civil-rights conspiracy).

155(a). The agreement pleaded here does not depend on treating the federal agencies as separate conspirators. It is pleaded as an agreement among the State and local Defendants and the federal Defendants, and it is supported independently by the same-day timing of the Arkansas Securities Department's second request and HUD's investigation (¶ 127), the Attorney General's public statements and open-ended review (¶¶ 40–40(a), 121), and City Manager Cameron's official statement (¶¶ 54–57).

156. The agreement may be proved by circumstantial evidence; it need not be explicit.

157. The Defendants committed overt acts in furtherance of the conspiracy.

158. The conspiracy was motivated by class-based, invidiously discriminatory animus. The Plaintiffs are members of a class defined by race and ethnicity (White/European heritage). The investigations target the Plaintiffs because RTTL's membership criteria reference European heritage and because media coverage portrayed RTTL as "whites-only." No other identity-based community has been subjected to the same multi-agency campaign. To the Plaintiffs' knowledge, only one comparable community — EPIC City — was the subject of a federal investigation at all, and that investigation was opened and closed within two months, on the community's own assurances, without any enforcement action. No similarly-situated community other than the Plaintiffs' has been the subject of simultaneous investigations by three agencies.

159. Plaintiffs plead the § 1985(3) elements expressly: (a) a conspiracy; (b) for the purpose of depriving Plaintiffs of the equal protection of the laws; (c) an act in furtherance of the conspiracy; and (d) injury. *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971). The independent federal rights are the First Amendment and equal protection rights pleaded in Counts I and III. The class-based, invidiously discriminatory animus is the race-based animus pleaded in ¶ 158. *Griffin*, 403 U.S. at 102.

160. As a direct and proximate result, the Plaintiffs have been deprived of their rights to free speech, free association, due process, and equal protection.

## COUNT III

### Equal Protection—Selective Enforcement (Against Defendants Dhillon, Pagnucco, Legomsky, Turner, Trainor, Meltesen, McGlincy, Doles, Marshall, and Joslin in Their Official Capacities)

161. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

162. The Equal Protection Clause of the Fourteenth Amendment, made applicable to the Federal Government by the Due Process Clause of the Fifth Amendment, prohibits the

Government from choosing the subjects of investigation, escalation, and enforcement on the basis of race, ethnicity, or national origin. A selective-enforcement claim requires the plaintiff to allege that he was treated differently from others similarly situated in all relevant respects, and that the difference was the product of intentional or purposeful discrimination — that the defendants acted "because of," not merely "in spite of," the plaintiff's race. *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979) (stating the standard for discriminatory purpose); *Wayte v. United States*, 470 U.S. 598, 608 (1985); *United States v. Armstrong*, 517 U.S. 456, 465 (1996).

162(a). **Vehicle.** The claims in this Count against Defendants Marshall and Joslin are brought under 42 U.S.C. § 1983. The claims against the federal Defendants are brought for prospective relief against officers of the United States. The cause of action is the equitable action against federal officers who violate the Constitution, recognized in *Armstrong v. Exceptional Child*, 575 U.S. at 327, and *Free Enterprise Fund*, 561 U.S. at 491–92 n.2. Sovereign immunity does not bar that relief because the officers acted outside their lawful authority and in violation of the Constitution, *Larson*, 337 U.S. at 689–91; *Dugan*, 372 U.S. at 620–22, and because 5 U.S.C. § 702 waives immunity for actions against agencies and officers seeking relief other than money damages. See ¶¶ 14(a), 146(a)–(b). In this Count, "the HUD Defendants" means Defendants Turner, Trainor, Meltesen, McGlincy, and Doles; "the DOJ Defendants" means Defendants Dhillon, Pagnucco, and Legomsky; and references to "HUD" and "DOJ" are to those agencies acting through those Defendants in their official capacities.

163. **Purpose.** Defendants Turner, Trainor, Meltesen, McGlincy, Doles, Dhillon, Pagnucco, and Legomsky selected the Plaintiffs for investigation and escalation because of the Plaintiffs' racial and ethnic identity as a White/European-heritage community — not merely in spite of it. The purpose is not inferred from the fact of investigation alone. It is inferred from the specific facts alleged above: the side-by-side treatment of the Plaintiffs and EPIC Real Properties on February 12, 2026 (¶¶ 68–78, 123–126); DOJ's June 13, 2025 closure of its investigation of

EPIC City on criteria the Plaintiffs satisfy (¶¶ 96–100); and the racial terms in which the investigations were opened, described, and defended (¶¶ 50, 55, 72, 81).

163(a). **Effect — HUD.** On February 12, 2026, the same office, through the same investigator, sent EPIC Real Properties a standard complaint-notification letter that presumed innocence, advised the recipient of his rights, offered conciliation, and stated that HUD had "made no determination as to whether the complaint against you has merit." On the same day it sent the Plaintiffs a letter that accused them of operating "under the guise of a 'private membership association'" and suggested they were "possibly fraudulently" selling communities. That the two letters performed different statutory functions is true and is not the point. The point is that HUD possessed, and routinely used, an even-handed procedure for telling a respondent what it was accused of and what rights it had, and it withheld that procedure from the Plaintiffs. Defendant Doles signed the February 12, 2026 letter to the Plaintiffs, and Defendant McGlincy was the named contact on both letters. ¶¶ 36, 68, 76.

163(b). **Effect — DOJ.** Defendants Dhillon and Pagnucco opened the investigation of the Plaintiffs on June 4, 2026, less than a year after they closed the EPIC City investigation over their own signatures. They closed that investigation on three criteria: the stage of development, the absence of permits, and the target's commitment to revise its marketing. The Plaintiffs satisfy each criterion more completely than EPIC did. ¶¶ 96–100.

163(c). **Departure from normal procedure.** A departure from normal procedure is evidence of discriminatory purpose. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). The HUD Defendants departed from their own notification template (¶¶ 123–126). The Arkansas Securities Department departed from its own practice across 1,209 published orders (¶ 61(a)). The DOJ Defendants applied to the Plaintiffs a closure standard they had applied differently to EPIC (¶¶ 96–100).

163(d). **Why the comparators are similarly situated.** The comparison is between communities that publicly organized around a shared identity and marketed themselves in identity-based terms. It is not a comparison of the ultimate merits of any Fair Housing Act theory. EPIC City was marketed as "a safe purpose-built community to serve the growing needs of the Muslim community" and "the epicenter of Islam in America." Lakefront Estates is marketed to Orthodox Jewish families. Black to the Land describes "planned, cooperative living spaces where African Americans gather to build safety, generational wealth, culture, and food sovereignty on their own terms." The Freedom Georgia Initiative is a Black-led cooperative settlement in Wilkinson County, Georgia, purchased by nineteen African-American families in 2020 and expanded to approximately 502 acres for self-sustaining agriculture, housing, and cultural space. Freedom Village Georgia is a 205-acre Black-owned village project in Hancock County, Georgia, in which more than 70 families hold land plots. RTTL's public statements about European heritage are of the same kind. The Government opened a federal investigation into one of these communities — EPIC City — and closed it within two months. It has not investigated any of the others. It has investigated the Plaintiffs with three agencies at once. The Defendants' stated basis — that the Plaintiffs' public statements implicated 42 U.S.C. § 3604(c) — does not explain why the same statute was not applied to the identity-based statements of the others.

163(e). The comparators are not limited to religious communities. Black to the Land, The Freedom Georgia Initiative, and Freedom Village Georgia organize explicitly around race, and none was investigated.

163(f). The Defendants may invoke 42 U.S.C. § 3607(a), which permits a religious organization to limit noncommercial housing to persons of the same religion. That exemption does not explain the difference in treatment here. It is a defense to liability, not a rule governing whom the Government investigates; it applies only to housing operated "for other than a commercial purpose," and EPIC City was a commercial development that had taken in roughly $40 million

from lot sales (¶ 100); and it does not permit discrimination "on account of race, color, or national origin." 42 U.S.C. § 3607(a).

## COUNT IV

### Compelled Speech — First Amendment (Against HUD Defendants in Their Official Capacities)

164. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

164(a). HUD has not disavowed the terms of the July 2, 2026 proposed conciliation agreement. Those terms reflect HUD's official position on what a reasonable conciliation requires, and HUD has not stated that it will not present them again in the formal-complaint process. Because HUD's statutory obligation to conciliate continues until a charge or a dismissal, 42 U.S.C. § 3610(b)(1), HUD remains free to present the same terms. The burden of showing that the conduct cannot reasonably be expected to recur rests with HUD. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

164(b). In the alternative, the capable-of-repetition exception applies. The conciliation window is too short to be fully litigated before it closes, and there is a reasonable expectation that the same demands will recur. *Spencer v. Kemna*, 523 U.S. 1, 17 (1998).

164(c). The July 2, 2026 proposed conciliation agreement specified the compelled speech it required. Section VI.E.23 required the Plaintiffs to publish government-mandated equal housing opportunity statements on all of their inherently expressive social media platforms, including YouTube, Substack, X, and Telegram. Section VI.E.24 restricted the Plaintiffs' use of the word "community." Section VI.G.27 required the Plaintiffs to advertise a $40,000 "Compensation Fund" at their own expense, with the fund distributed by HUD without independent oversight, judicial review, a standard of proof, or an underlying complaint from any individual claiming

discrimination. The agreement also imposed a $10,000 civil penalty (§ VI.H.31) and three years of government monitoring with mandatory reporting. These are the terms HUD has not disavowed.

165. The First Amendment prohibits the government from compelling private speech. The unconstitutional conditions doctrine separately prohibits the government from conditioning a benefit or the termination of an investigation on the surrender of a constitutional right. The government also may not use regulatory or enforcement leverage to coerce third parties into punishing or suppressing disfavored speech.

166. The HUD conciliation agreement demanded compelled speech in violation of the First Amendment.

**COUNT V**

**Due Process—Fifth and Fourteenth Amendments (Against HUD Defendants and Defendants Marshall and Joslin in Their Official Capacities)**

167. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

168. The Due Process Clause requires fair notice before the government imposes burdens on individual rights. The original HUD investigation was addressed only to Wisdom Woods LLC and Eric Orwoll yet immediately named Return to the Land as the primary subject of the investigation. Without any notice, Global Homesteads Solutions LLC and North Arkansas Excavation LLC were included in HUD's subsequent Request for Information, despite not being named Respondents. Continuing in this manner, HUD added Peter Julius Csere, Scott Thomas Hallowood, and two other individuals to the draft of the conciliation agreement as additional Respondents. None of these parties received an investigation initiation letter or any other notice before being named as Respondents subject to obligations including payment into a $40,000 Compensation Fund, submission to government monitoring, and alteration of their speech and association. Among those added without notice were two citizens of different states with no

connection to any Arkansas real estate. Additionally, Global Homestead Solutions LLC and North Arkansas Excavation LLC are service companies that do not sell, rent, or broker real property and had no reason to believe they were subjects of a federal housing discrimination investigation. When the Plaintiffs' counsel inquired in writing as to who was under investigation early on in the course of the investigation, HUD did not respond. Adding parties to a settlement agreement without prior notice and without giving those persons a chance to participate in the investigation violates the most basic requirements of procedural due process.

169. An open government investigation imposes significant burdens: reputational harm combined with alteration of legal rights or status, ongoing document preservation obligations, legal uncertainty that precludes the Plaintiffs from representing to third parties that the matter is resolved, and the concrete chilling of constitutionally protected speech and association. The Arkansas Securities Department investigation, opened without complaint, has run for more than a year. Defendant Joslin, the examining attorney, stated that no administrative action is planned and no further information is needed. Yet Commissioner Marshall refuses to close the investigation or provide written confirmation. An investigation that the Department's examining attorney has said requires no further action, yet that the Commissioner refuses to close, serves no legitimate purpose. It serves only to punish, stigmatize, chill, and burden. This is a penalty imposed without hearing, without findings, without any avenue for closure. The Commissioner's maintenance of the file also violates due process by evading judicial review. An investigation that never results in final agency action is difficult to challenge. By refusing to close while disclaiming enforcement intent, the Commissioner has placed the Plaintiffs in a due process no-man's-land.

169(a). The Arkansas Securities Commissioner's rules contain no investigation procedure. 23 Code of Arkansas Rules § 300-205 is captioned "Investigations. [Reserved]." There is no mechanism by which a person under investigation may obtain closure. The Commissioner "may make any public or private investigations," Ark. Code Ann. § 23-42-205(a)(1), and determines in

his or her discretion whether any proceeding becomes public, § 23-42-203(e). An investigation that cannot be closed by rule and cannot be reviewed by anyone is the "no-man's-land" alleged above.

169(b). Under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the private interest is substantial: the investigation imposes reputational harm, chills associational rights, requires ongoing document preservation, and imposes legal costs, and the refusal to close leaves Plaintiffs unable to obtain a written statement that the matter is resolved. The risk of erroneous deprivation is high because the Commissioner's rules provide no investigation procedure, no mechanism to obtain closure, and no hearing at which the basis for the investigation can be tested. The value of additional safeguards is correspondingly high: a written statement of the basis for the investigation and a written closure decision would give Plaintiffs a meaningful opportunity to respond and to obtain review. The government's interest in investigating securities violations is legitimate, but it does not require an indefinite, uncloseable file after the examining attorney has stated that no administrative action is planned and no further information is needed.

169(c). The burdens are concrete, not abstract. The investigation has run for more than a year. Plaintiffs produced 159 Bates-numbered pages and thirteen additional items over nearly nine months of production. They remain under document-preservation obligations, have incurred legal fees, and cannot obtain a closure letter or a written statement of the basis for the investigation. Those burdens, combined with the reputational harm of being named in an open securities investigation and the chill of protected speech and association, supply the "plus" beyond reputational injury.

169(d). HUD identified Mr. Csere and Mr. Hallowood as respondents, and sought their signatures on a conciliation agreement, without serving the written notice that 42 U.S.C. § 3610(a)(2)(B) requires to explain the basis for joining them. Being named a respondent in a federal housing investigation, and asked to sign a conciliation agreement that demanded a $40,000

compensation fund, a $10,000 civil penalty, three years of government monitoring, and restrictions on their speech and association, without notice of the basis for the charge, imposes the reputational and practical burdens that satisfy the stigma-plus standard.

## COUNT VI

### Declaratory Relief — 28 U.S.C. §§ 2201–2202 (Remedy for Counts I–V and VII)

170. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

171. An actual controversy exists between the Plaintiffs and each of the Defendants. The investigations remain outstanding, and Plaintiffs continue to suffer injury "for as long as [the demand] remains outstanding." *First Choice*, 608 U.S. at 189. The controversy is ripe, the issues are fit for judicial decision, and the Plaintiffs suffer ongoing harm — reputational harm, document-preservation obligations, legal uncertainty, and the chilling of constitutionally protected speech and association.

172. The Declaratory Judgment Act does not create a cause of action; it authorizes the remedy of a declaration on the claims pleaded in Counts I through V and VII. Because the Plaintiffs are entitled to that relief, the Court should declare that: (a) the FHA does not apply to RTTL's membership criteria, internal governance, or associational activities because RTTL does not sell, rent, broker, or otherwise make available dwellings, and RTTL's internal membership decisions are not "real estate-related transactions"; (b) RTTL's membership criteria are protected by the First Amendment right of expressive association, and RTTL qualifies as a bona fide private membership association whose internal membership decisions are not subject to the Fair Housing Act; (c) HUD's threatened reimposition of the compelled-speech, associational-language, and compensation-fund terms of the July 2, 2026 proposed conciliation agreement in any future conciliation or settlement would violate the First Amendment; (d) HUD's Secretary-initiated investigation violates the First Amendment, Due Process Clause, and Equal Protection; (e)

Defendant Marshall's maintenance of the securities investigation of Wisdom Woods LLC, after the examining attorney stated that no administrative action was planned and no further information was needed, violates the First Amendment and the Due Process Clause; (f) Defendant Marshall's maintenance of the securities investigation of Global Homestead Solutions LLC, North Arkansas Excavation LLC, and Allegory Acres LLC violates the First Amendment and the Equal Protection Clause, because none of them could have issued a security: Global Homestead Solutions LLC and North Arkansas Excavation LLC are single-member companies with no membership interests to sell, and Allegory Acres LLC has eight founding members who acquired their interests at formation (for shared ownership and use rather than for investment), but never acquired land, never publicly announced a plan to acquire land, and never sold a membership interest; (g) the DOJ's indefinite maintenance of an open investigation without responding to the Plaintiffs' July 13, 2026 submission, while the Plaintiffs remain under document-preservation obligations and the threat of litigation, violates the Due Process Clause; (h) Defendant Cameron's continuing refusal to retract his July 29, 2025 official statement, and to disavow further official statements condemning Plaintiffs based on media reports, violates the First Amendment; (i) the Defendants' investigations of Plaintiffs, insofar as they rest on media coverage, public commentary, political characterizations, or alleged ideology rather than on evidence of an actual sale, rental, or other regulated real estate transaction, are contrary to the Fair Housing Act and to the Due Process Clause; (j) the Defendants' treatment of RTTL's membership process as a housing transaction, absent evidence that RTTL itself sold, rented, or otherwise made available a dwelling, is contrary to the Fair Housing Act.

## COUNT VII

### Violation of the Administrative Procedure Act — 5 U.S.C. § 706 (Against DOJ and HUD in Their Official Capacities)

173. The Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

174. The APA authorizes this Court to set aside agency action that is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law” (§ 706(2)(A)), “contrary to constitutional right” (§ 706(2)(B)), or “in excess of statutory jurisdiction” (§ 706(2)(C)), and to “compel agency action unlawfully withheld or unreasonably delayed” (§ 706(1)).

175. Section 3610(a)(2)(B) requires that a person joined as a respondent receive written notice explaining "the basis for the Secretary's belief that the person to whom the notice is addressed is properly joined as a respondent." Mr. Csere and Mr. Hallowood were named as respondents in HUD's August 24, 2026 complaint, and the notices they received did not explain the basis for joining either of them.

175(b). The August 24 complaint does not supply the missing explanation. It identifies Mr. Csere as "Secretary, Wisdom Woods, LLC" and Mr. Hallowood as "President," and describes the scheme generally. It does not explain what either individual did, or why each is properly joined as a respondent rather than merely an officer or employee of a corporate respondent.

175(c). Gavin Baker and Alan Mock prove how the roster was assembled. HUD listed both as respondents in the July 2, 2026 conciliation agreement, with signature blocks, then dropped both from the August 24 complaint — without any joinder notice in either direction. The list was built without the § 3610(a)(2) process.

175(d). HUD's failure to perform a discrete, legally required act is reviewable under 5 U.S.C. § 706(1). *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–65 (2004). The relief sought is an order requiring HUD to serve a compliant § 3610(a)(2) notice explaining the basis for joining

each Plaintiff and to afford them an opportunity to respond before proceeding. To the extent HUD contends that the August 24 complaint or a later letter was the required notice, that contention fails for the reason stated in ¶ 175(b).

175(e). In the alternative. If the Court concludes that HUD's August 4, 2026 conversion of the matter to a complaint was effective notwithstanding the absence of the regulatory predicates pleaded in ¶ 90(a), then that action consummated HUD's decisionmaking on the conciliation track and determined the parties' legal obligations. That action is final agency action under 5 U.S.C. § 704, and it is arbitrary, capricious, and contrary to constitutional right under § 706(2)(A) and (B).

175(f). In the alternative, HUD's assertion of jurisdiction over RTTL, and its investigation of RTTL's membership criteria and internal governance, exceed the authority conferred by 42 U.S.C. § 3610, because the Fair Housing Act reaches only discriminatory housing practices in the sale, rental, or financing of dwellings and in brokerage services, 42 U.S.C. §§ 3604–3606. RTTL does not sell, rent, broker, or otherwise make available dwellings. ¶¶ 20, 24, 42. HUD's action is therefore "in excess of statutory jurisdiction" within the meaning of 5 U.S.C. § 706(2)(C) and must be set aside.

176. The DOJ opened its investigation on June 4, 2026, in a letter signed by Defendant Dhillon that invoked the Attorney General's authority to file suit under 42 U.S.C. § 3614(a). Plaintiffs served a comprehensive response on July 13, 2026, addressing the matters raised in the letter and requesting a meeting. DOJ has not responded to the submission, has not responded to multiple meeting requests, and has not communicated with Plaintiffs in any manner. More than five months have passed since DOJ opened its investigation, and nearly four months have passed since the Plaintiffs' July 13, 2026 response. The investigation remains open, and Plaintiffs remain under document-preservation obligations and the threat of federal litigation.

176(a). The delay is unreasonable under 5 U.S.C. § 706(1). The factors of *Telecommunications Research & Action Center v. FCC* (*TRAC*), 750 F.2d 70, 80 (D.C. Cir. 1984), apply:

(i) Rule of reason. Four months of silence after a complete response to a narrow investigation exceeds any reasonable time.

(ii) Statutory benchmark. Congress required HUD to complete an FHA investigation within 100 days, 42 U.S.C. § 3610(a)(1)(B)(iv), and required a written statement of reasons when it could not. DOJ's § 3614(a) authority carries no such deadline, but the Act's structure confirms that Congress did not contemplate indefinite, unexplained silence.

(iii) Human health and welfare. The delay burdens constitutional rights speech, association, and assembly — not economic regulation.

(iv) Competing priorities. DOJ has identified none and has offered no explanation for the delay.

(v) Nature and extent of the interests. The open investigation chills speech, stigmatizes Plaintiffs, and imposes preservation and legal burdens; the injury continues for as long as the investigation remains open. *First Choice*, 608 U.S. at 189.

(vi) Impropriety. No finding of impropriety is required; the investigation's media-driven origin and DOJ's silence after full compliance are relevant context. *TRAC*, 750 F.2d at 80.

176(b). The prayer for relief seeks an order terminating the DOJ investigation on the constitutional claims. Prayer ¶ B.c. This sub-count is pleaded in the alternative and seeks only an order compelling DOJ to respond to the July 13, 2026 submission and to complete its review within a reasonable time if the Court does not reach the constitutional claims.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court grant the following relief:

**A. Declaratory Relief**

a. A declaratory judgment that the Fair Housing Act does not apply to RTTL's membership criteria, internal governance, or associational activities because RTTL does not sell, rent, broker, or otherwise make available dwellings within the meaning of the Act (Counts I, III, and VII);

b. A declaratory judgment that RTTL's membership criteria are protected by the First Amendment right of expressive association and that RTTL is a bona fide private membership association whose internal membership decisions are not subject to the Fair Housing Act because RTTL does not itself provide, offer, sell, rent, broker, or otherwise make available dwellings or real estate (Counts I and III);

c. A declaratory judgment that the compelled-speech provisions of the HUD conciliation agreement violate the First Amendment (Count IV);

d. A declaratory judgment that the Secretary-initiated investigation of Plaintiffs (HUD Inquiry 869910), in the absence of any underlying complaint and in the presence of evidence of selective enforcement on the basis of race, ethnicity, national origin, and viewpoint, violates the First Amendment, the Due Process Clause, and the Equal Protection guarantee (Counts I, III, and V);

e. A declaratory judgment that Defendant Marshall's maintenance of the securities investigation of Wisdom Woods LLC, after the examining attorney stated that no administrative action was planned and no further information was needed, violates the First Amendment and the Due Process Clause (Count V);

f. A declaratory judgment that Defendant Marshall's maintenance of the securities investigation of Global Homestead Solutions LLC, North Arkansas Excavation LLC, and Allegory Acres LLC violates the First Amendment and the Equal Protection Clause because the investigation had no securities subject: Global Homestead Solutions LLC and North Arkansas Excavation LLC are single-member companies with no membership interests to sell, and Allegory

Acres LLC has eight founding members who acquired their interests at formation (for shared ownership and use rather than for investment), but it never acquired land, never publicly announced a plan to acquire land, and never sold a membership interest (Count V);

g. A declaratory judgment that the DOJ's indefinite maintenance of an open investigation without responding to the Plaintiffs' submission, while the Plaintiffs remain under document preservation obligations and threat of litigation, violates the Due Process Clause (Count V);

h. A declaratory judgment that Defendant Cameron's continuing refusal to retract his July 29, 2025, official statement, and to disavow further official statements condemning Plaintiffs based on media reports, violates the First Amendment (Count I);

i. A declaratory judgment that the Defendants' investigations of Plaintiffs, insofar as they rest on media coverage, public commentary, political characterizations, or alleged ideology rather than on evidence of an actual sale, rental, or other regulated real estate transaction, are contrary to the Fair Housing Act and to the Due Process Clause (Counts I and VII);

j. A declaratory judgment that the Defendants' treatment of RTTL's membership process as a housing transaction, absent evidence that RTTL itself sold, rented, or otherwise made available a dwelling, is contrary to the Fair Housing Act (Counts I and VII).

**B. Injunctive Relief**

a. A permanent injunction directing HUD to terminate the Secretary-initiated investigation (Inquiry 869910) and the Secretary-Initiated Complaint against the Plaintiffs;

b. A permanent injunction directing HUD to refrain from demanding compelled speech, associational language restrictions, or advertising of compensation funds in any conciliation or settlement;

c. A permanent injunction directing the DOJ to close its investigation (DJ# 175-9-147);

d. A permanent injunction directing Commissioner Marshall, in her official capacity, to close the securities investigation of Plaintiffs in writing within fourteen days of the Court's order, and enjoining any further information requests, document demands, or other process in that matter;

e. A permanent injunction directing Defendant Cameron to retract his July 29, 2025, statement and to refrain from issuing official statements condemning the Plaintiffs based on media reports;

f. A permanent injunction prohibiting all Defendants from opening new investigations of Plaintiffs based on the same facts, theories, or media coverage that gave rise to the investigations challenged in this action;

g. A permanent injunction prohibiting all Defendants from adding individuals to investigations without prior written notice and an opportunity to respond.

**C. Other Relief**

a. Retention of jurisdiction to ensure compliance;

b. Attorneys' fees and costs under 42 U.S.C. § 1988(b), 28 U.S.C. § 2412 (EAJA), and any other applicable provisions;

c. Such other and further relief as the Court deems just and proper.

Dated: November 12, 2026

[SIGNATURE ON FOLLOWING PAGE]

Respectfully submitted,
/s/ Jonathan Gross
Jonathan Gross (MD Bar ID: 1912170138)
LAW OFFICE OF JONATHAN GROSS
2533 Smith Ave., Suite 331
Baltimore, MD 21209
(443) 813-0141
jon@jonathangross.law
Attorney for Plaintiffs